# LAWRENCE ET AL. *v.* TEXAS

No. 02–102.   Argued March 26, 2003—Decided June 26, 2003

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 579. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and THOMAS, J., joined, *post*, p. 586. THOMAS, J., filed a dissenting opinion, *post*, p. 605.

*Paul M. Smith* argued the cause for petitioners. With him on the briefs were *William M. Hohengarten, Daniel Mach, Mitchell Katine, Ruth E. Harlow, Patricia M. Logue,* and *Susan L. Sommer.*

*Charles A. Rosenthal, Jr.,* argued the cause for respondent. With him on the brief were *William J. Delmore III* and *Scott A. Durfee.**

---

*Briefs of *amici curiae* urging reversal were filed for the Alliance of Baptists et al. by *Robert A. Long, Jr.,* and *Thomas L. Cubbage III;* for the American Psychological Association et al. by *David W. Ogden, Paul R. Q. Wolfson, Richard G. Taranto, Nathalie F. P. Gilfoyle,* and *Carolyn I. Polowy;* for the American Public Health Association et al. by *Jeffrey S. Trachtman* and *Norman C. Simon;* for the Cato Institute by *Robert A. Levy;* for Constitutional Law Professors by *Pamela S. Karlan* and *William B. Rubenstein;* for the Human Rights Campaign et al. by *Walter Dellinger, Pamela Harris,* and *Jonathan D. Hacker;* for the Log Cabin Republicans et al. by *C. Martin Meekins;* for the NOW Legal Defense and Education Fund by *David C. Codell, Laura W. Brill,* and *Wendy R. Weiser;* for Professors of History by *Roy T. Englert, Jr., Alan Untereiner,* and *Sherri Lynn Wolson;* for the Republican Unity Coalition et al. by *Erik S. Jaffe;* and for Mary Robinson et al. by *Harold Hongju Koh* and *Joseph F. Tringali.*

Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *William H. Pryor, Jr.,* Attorney General of Alabama, *Nathan A. Forrester,* Solicitor General, and *George M. Weaver,* and by the Attorneys General for their respective States as follows: *Henry D. McMaster* of South Carolina and *Mark L. Shurtleff* of Utah; for Agudath Israel of America by *David Zwiebel;* for the American Center for Law and Justice by *Jay Alan Sekulow, Stuart J. Roth, Colby M. May, James M. Henderson, Sr., Joel H. Thornton,* and *Walter M. Weber;* for the American Family Association, Inc., et al. by *Stephen M. Crampton, Brian Fahling,* and *Michael J. DePrimo;* for the Center for Arizona Policy et al. by *Len L. Munsil;* for the Center for Law and Justice International by *Thomas Patrick Monaghan* and *John P. Tuskey;* for the Center for Marriage Law by *Vincent P. McCarthy* and *Lynn D. Wardle;* for the Center

JUSTICE KENNEDY delivered the opinion of the Court.

Liberty protects the person from unwarranted government intrusions into a dwelling or other private places. In our tradition the State is not omnipresent in the home. And there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence. Freedom extends beyond spatial bounds. Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct. The instant case involves liberty of the person both in its spatial and in its more transcendent dimensions.

## I

The question before the Court is the validity of a Texas statute making it a crime for two persons of the same sex to engage in certain intimate sexual conduct.

In Houston, Texas, officers of the Harris County Police Department were dispatched to a private residence in response to a reported weapons disturbance. They entered an apartment where one of the petitioners, John Geddes Lawrence,

for the Original Intent of the Constitution by *Michael P. Farris* and *Jordan W. Lorence;* for Concerned Women for America by *Janet M. LaRue;* for the Family Research Council, Inc., by *Robert P. George;* for First Principles, Inc., by *Ronald D. Ray;* for Liberty Counsel by *Mathew D. Staver* and *Rena M. Lindevaldsen;* for the Pro Family Law Center et al. by *Richard D. Ackerman* and *Gary G. Kreep;* for Public Advocate of the United States et al. by *Herbert W. Titus* and *William J. Olson;* for the Texas Eagle Forum et al. by *Teresa Stanton Collett;* for Texas Legislator Warren Chisum et al. by *Kelly Shackelford* and *Scott Roberts;* for the Texas Physicians Resource Council et al. by *Glen Lavy;* and for United Families International by *Paul Benjamin Linton.*

Briefs of *amici curiae* were filed for the American Bar Association by *Alfred P. Carlton, Jr., Ruth N. Borenstein,* and *Beth S. Brinkmann;* for the American Civil Liberties Union et al. by *Laurence H. Tribe, James D. Esseks, Steven R. Shapiro,* and *Matthew A. Coles;* for the Institute for Justice by *William H. Mellor, Clint Bolick, Dana Berliner,* and *Randy E. Barnett;* and for the National Lesbian and Gay Law Association et al. by *Chai R. Feldblum, J. Paul Oetken,* and *Scott Ruskay-Kidd.*

resided. The right of the police to enter does not seem to have been questioned. The officers observed Lawrence and another man, Tyron Garner, engaging in a sexual act. The two petitioners were arrested, held in custody overnight, and charged and convicted before a Justice of the Peace.

The complaints described their crime as "deviate sexual intercourse, namely anal sex, with a member of the same sex (man)." App. to Pet. for Cert. 127a, 139a. The applicable state law is Tex. Penal Code Ann. § 21.06(a) (2003). It provides: "A person commits an offense if he engages in deviate sexual intercourse with another individual of the same sex." The statute defines "[d]eviate sexual intercourse" as follows:

> "(A) any contact between any part of the genitals of one person and the mouth or anus of another person; or
>
> "(B) the penetration of the genitals or the anus of another person with an object." § 21.01(1).

The petitioners exercised their right to a trial *de novo* in Harris County Criminal Court. They challenged the statute as a violation of the Equal Protection Clause of the Fourteenth Amendment and of a like provision of the Texas Constitution. Tex. Const., Art. 1, § 3a. Those contentions were rejected. The petitioners, having entered a plea of *nolo contendere,* were each fined $200 and assessed court costs of $141.25. App. to Pet. for Cert. 107a–110a.

The Court of Appeals for the Texas Fourteenth District considered the petitioners' federal constitutional arguments under both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. After hearing the case en banc the court, in a divided opinion, rejected the constitutional arguments and affirmed the convictions. 41 S. W. 3d 349 (2001). The majority opinion indicates that the Court of Appeals considered our decision in *Bowers* v. *Hardwick,* 478 U. S. 186 (1986), to be controlling on the federal due process aspect of the case. *Bowers* then being authoritative, this was proper.

We granted certiorari, 537 U. S. 1044 (2002), to consider three questions:

> 1. Whether petitioners' criminal convictions under the Texas "Homosexual Conduct" law—which criminalizes sexual intimacy by same-sex couples, but not identical behavior by different-sex couples—violate the Fourteenth Amendment guarantee of equal protection of the laws.
>
> 2. Whether petitioners' criminal convictions for adult consensual sexual intimacy in the home violate their vital interests in liberty and privacy protected by the Due Process Clause of the Fourteenth Amendment.
>
> 3. Whether *Bowers* v. *Hardwick, supra,* should be overruled? See Pet. for Cert. i.

The petitioners were adults at the time of the alleged offense. Their conduct was in private and consensual.

## II

We conclude the case should be resolved by determining whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution. For this inquiry we deem it necessary to reconsider the Court's holding in *Bowers.*

There are broad statements of the substantive reach of liberty under the Due Process Clause in earlier cases, including *Pierce* v. *Society of Sisters,* 268 U. S. 510 (1925), and *Meyer* v. *Nebraska,* 262 U. S. 390 (1923); but the most pertinent beginning point is our decision in *Griswold* v. *Connecticut,* 381 U. S. 479 (1965).

In *Griswold* the Court invalidated a state law prohibiting the use of drugs or devices of contraception and counseling or aiding and abetting the use of contraceptives. The Court described the protected interest as a right to privacy and

placed emphasis on the marriage relation and the protected space of the marital bedroom.  *Id.*, at 485.

After *Griswold* it was established that the right to make certain decisions regarding sexual conduct extends beyond the marital relationship.  In *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972), the Court invalidated a law prohibiting the distribution of contraceptives to unmarried persons.  The case was decided under the Equal Protection Clause, *id.*, at 454; but with respect to unmarried persons, the Court went on to state the fundamental proposition that the law impaired the exercise of their personal rights, *ibid.*  It quoted from the statement of the Court of Appeals finding the law to be in conflict with fundamental human rights, and it followed with this statement of its own:

> "It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. . . . If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."  *Id.*, at 453.

The opinions in *Griswold* and *Eisenstadt* were part of the background for the decision in *Roe* v. *Wade*, 410 U. S. 113 (1973).  As is well known, the case involved a challenge to the Texas law prohibiting abortions, but the laws of other States were affected as well.  Although the Court held the woman's rights were not absolute, her right to elect an abortion did have real and substantial protection as an exercise of her liberty under the Due Process Clause.  The Court cited cases that protect spatial freedom and cases that go well beyond it.  *Roe* recognized the right of a woman to make certain fundamental decisions affecting her destiny and confirmed once more that the protection of liberty under the Due Process Clause has a substantive dimension of fundamental significance in defining the rights of the person.

In *Carey* v. *Population Services Int'l*, 431 U. S. 678 (1977), the Court confronted a New York law forbidding sale or distribution of contraceptive devices to persons under 16 years of age. Although there was no single opinion for the Court, the law was invalidated. Both *Eisenstadt* and *Carey*, as well as the holding and rationale in *Roe*, confirmed that the reasoning of *Griswold* could not be confined to the protection of rights of married adults. This was the state of the law with respect to some of the most relevant cases when the Court considered *Bowers* v. *Hardwick*.

The facts in *Bowers* had some similarities to the instant case. A police officer, whose right to enter seems not to have been in question, observed Hardwick, in his own bedroom, engaging in intimate sexual conduct with another adult male. The conduct was in violation of a Georgia statute making it a criminal offense to engage in sodomy. One difference between the two cases is that the Georgia statute prohibited the conduct whether or not the participants were of the same sex, while the Texas statute, as we have seen, applies only to participants of the same sex. Hardwick was not prosecuted, but he brought an action in federal court to declare the state statute invalid. He alleged he was a practicing homosexual and that the criminal prohibition violated rights guaranteed to him by the Constitution. The Court, in an opinion by Justice White, sustained the Georgia law. Chief Justice Burger and Justice Powell joined the opinion of the Court and filed separate, concurring opinions. Four Justices dissented. 478 U. S., at 199 (opinion of Blackmun, J., joined by Brennan, Marshall, and STEVENS, JJ.); *id.*, at 214 (opinion of STEVENS, J., joined by Brennan and Marshall, JJ.).

The Court began its substantive discussion in *Bowers* as follows: "The issue presented is whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so

for a very long time." *Id.*, at 190. That statement, we now conclude, discloses the Court's own failure to appreciate the extent of the liberty at stake. To say that the issue in *Bowers* was simply the right to engage in certain sexual conduct demeans the claim the individual put forward, just as it would demean a married couple were it to be said marriage is simply about the right to have sexual intercourse. The laws involved in *Bowers* and here are, to be sure, statutes that purport to do no more than prohibit a particular sexual act. Their penalties and purposes, though, have more far-reaching consequences, touching upon the most private human conduct, sexual behavior, and in the most private of places, the home. The statutes do seek to control a personal relationship that, whether or not entitled to formal recognition in the law, is within the liberty of persons to choose without being punished as criminals.

This, as a general rule, should counsel against attempts by the State, or a court, to define the meaning of the relationship or to set its boundaries absent injury to a person or abuse of an institution the law protects. It suffices for us to acknowledge that adults may choose to enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons. When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. The liberty protected by the Constitution allows homosexual persons the right to make this choice.

Having misapprehended the claim of liberty there presented to it, and thus stating the claim to be whether there is a fundamental right to engage in consensual sodomy, the *Bowers* Court said: "Proscriptions against that conduct have ancient roots." *Id.*, at 192. In academic writings, and in many of the scholarly *amicus* briefs filed to assist the Court in this case, there are fundamental criticisms of the historical premises relied upon by the majority and concurring opin-

ions in *Bowers.* Brief for Cato Institute as *Amicus Curiae* 16–17; Brief for American Civil Liberties Union et al. as *Amici Curiae* 15–21; Brief for Professors of History et al. as *Amici Curiae* 3–10. We need not enter this debate in the attempt to reach a definitive historical judgment, but the following considerations counsel against adopting the definitive conclusions upon which *Bowers* placed such reliance.

At the outset it should be noted that there is no longstanding history in this country of laws directed at homosexual conduct as a distinct matter. Beginning in colonial times there were prohibitions of sodomy derived from the English criminal laws passed in the first instance by the Reformation Parliament of 1533. The English prohibition was understood to include relations between men and women as well as relations between men and men. See, *e. g.*, *King* v. *Wiseman*, 92 Eng. Rep. 774, 775 (K. B. 1718) (interpreting "mankind" in Act of 1533 as including women and girls). Nineteenth-century commentators similarly read American sodomy, buggery, and crime-against-nature statutes as criminalizing certain relations between men and women and between men and men. See, *e. g.*, 2 J. Bishop, Criminal Law § 1028 (1858); 2 J. Chitty, Criminal Law 47–50 (5th Am. ed. 1847); R. Desty, A Compendium of American Criminal Law 143 (1882); J. May, The Law of Crimes § 203 (2d ed. 1893). The absence of legal prohibitions focusing on homosexual conduct may be explained in part by noting that according to some scholars the concept of the homosexual as a distinct category of person did not emerge until the late 19th century. See, *e. g.*, J. Katz, The Invention of Heterosexuality 10 (1995); J. D'Emilio & E. Freedman, Intimate Matters: A History of Sexuality in America 121 (2d ed. 1997) ("The modern terms *homosexuality* and *heterosexuality* do not apply to an era that had not yet articulated these distinctions"). Thus early American sodomy laws were not directed at homosexuals as such but instead sought to prohibit nonprocreative sexual activity more generally. This does not suggest approval of

homosexual conduct. It does tend to show that this particular form of conduct was not thought of as a separate category from like conduct between heterosexual persons.

Laws prohibiting sodomy do not seem to have been enforced against consenting adults acting in private. A substantial number of sodomy prosecutions and convictions for which there are surviving records were for predatory acts against those who could not or did not consent, as in the case of a minor or the victim of an assault. As to these, one purpose for the prohibitions was to ensure there would be no lack of coverage if a predator committed a sexual assault that did not constitute rape as defined by the criminal law. Thus the model sodomy indictments presented in a 19th-century treatise, see 2 Chitty, *supra*, at 49, addressed the predatory acts of an adult man against a minor girl or minor boy. Instead of targeting relations between consenting adults in private, 19th-century sodomy prosecutions typically involved relations between men and minor girls or minor boys, relations between adults involving force, relations between adults implicating disparity in status, or relations between men and animals.

To the extent that there were any prosecutions for the acts in question, 19th-century evidence rules imposed a burden that would make a conviction more difficult to obtain even taking into account the problems always inherent in prosecuting consensual acts committed in private. Under then-prevailing standards, a man could not be convicted of sodomy based upon testimony of a consenting partner, because the partner was considered an accomplice. A partner's testimony, however, was admissible if he or she had not consented to the act or was a minor, and therefore incapable of consent. See, *e. g.*, F. Wharton, Criminal Law 443 (2d ed. 1852); 1 F. Wharton, Criminal Law 512 (8th ed. 1880). The rule may explain in part the infrequency of these prosecutions. In all events that infrequency makes it difficult to say that society approved of a rigorous and systematic

punishment of the consensual acts committed in private and by adults. The longstanding criminal prohibition of homosexual sodomy upon which the *Bowers* decision placed such reliance is as consistent with a general condemnation of nonprocreative sex as it is with an established tradition of prosecuting acts because of their homosexual character.

The policy of punishing consenting adults for private acts was not much discussed in the early legal literature. We can infer that one reason for this was the very private nature of the conduct. Despite the absence of prosecutions, there may have been periods in which there was public criticism of homosexuals as such and an insistence that the criminal laws be enforced to discourage their practices. But far from possessing "ancient roots," *Bowers,* 478 U. S., at 192, American laws targeting same-sex couples did not develop until the last third of the 20th century. The reported decisions concerning the prosecution of consensual, homosexual sodomy between adults for the years 1880–1995 are not always clear in the details, but a significant number involved conduct in a public place. See Brief for American Civil Liberties Union et al. as *Amici Curiae* 14–15, and n. 18.

It was not until the 1970's that any State singled out same-sex relations for criminal prosecution, and only nine States have done so. See 1977 Ark. Gen. Acts no. 828; 1983 Kan. Sess. Laws p. 652; 1974 Ky. Acts p. 847; 1977 Mo. Laws p. 687; 1973 Mont. Laws p. 1339; 1977 Nev. Stats. p. 1632; 1989 Tenn. Pub. Acts ch. 591; 1973 Tex. Gen. Laws ch. 399; see also *Post* v. *State,* 715 P. 2d 1105 (Okla. Crim. App. 1986) (sodomy law invalidated as applied to different-sex couples). Post-*Bowers* even some of these States did not adhere to the policy of suppressing homosexual conduct. Over the course of the last decades, States with same-sex prohibitions have moved toward abolishing them. See, *e. g., Jegley* v. *Picado,* 349 Ark. 600, 80 S. W. 3d 332 (2002); *Gryczan* v. *State,* 283 Mont. 433, 942 P. 2d 112 (1997); *Campbell* v. *Sundquist,* 926 S. W. 2d 250 (Tenn. App. 1996); *Commonwealth* v. *Wasson,*

842 S. W. 2d 487 (Ky. 1992); see also 1993 Nev. Stats. p. 518 (repealing Nev. Rev. Stat. § 201.193).

In summary, the historical grounds relied upon in *Bowers* are more complex than the majority opinion and the concurring opinion by Chief Justice Burger indicate. Their historical premises are not without doubt and, at the very least, are overstated.

It must be acknowledged, of course, that the Court in *Bowers* was making the broader point that for centuries there have been powerful voices to condemn homosexual conduct as immoral. The condemnation has been shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family. For many persons these are not trivial concerns but profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives. These considerations do not answer the question before us, however. The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. "Our obligation is to define the liberty of all, not to mandate our own moral code." *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 850 (1992).

Chief Justice Burger joined the opinion for the Court in *Bowers* and further explained his views as follows: "Decisions of individuals relating to homosexual conduct have been subject to state intervention throughout the history of Western civilization. Condemnation of those practices is firmly rooted in Judeao-Christian moral and ethical standards." 478 U. S., at 196. As with Justice White's assumptions about history, scholarship casts some doubt on the sweeping nature of the statement by Chief Justice Burger as it pertains to private homosexual conduct between consenting adults. See, *e. g.,* Eskridge, Hardwick and Historiography, 1999 U. Ill. L. Rev. 631, 656. In all events we think that our laws and traditions in the past half century are of

most relevance here. These references show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex. "[H]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry." *County of Sacramento* v. *Lewis*, 523 U. S. 833, 857 (1998) (KENNEDY, J., concurring).

This emerging recognition should have been apparent when *Bowers* was decided. In 1955 the American Law Institute promulgated the Model Penal Code and made clear that it did not recommend or provide for "criminal penalties for consensual sexual relations conducted in private." ALI, Model Penal Code § 213.2, Comment 2, p. 372 (1980). It justified its decision on three grounds: (1) The prohibitions undermined respect for the law by penalizing conduct many people engaged in; (2) the statutes regulated private conduct not harmful to others; and (3) the laws were arbitrarily enforced and thus invited the danger of blackmail. ALI, Model Penal Code, Commentary 277–280 (Tent. Draft No. 4, 1955). In 1961 Illinois changed its laws to conform to the Model Penal Code. Other States soon followed. Brief for Cato Institute as *Amicus Curiae* 15–16.

In *Bowers* the Court referred to the fact that before 1961 all 50 States had outlawed sodomy, and that at the time of the Court's decision 24 States and the District of Columbia had sodomy laws. 478 U. S., at 192–193. Justice Powell pointed out that these prohibitions often were being ignored, however. Georgia, for instance, had not sought to enforce its law for decades. *Id.*, at 197–198, n. 2 ("The history of nonenforcement suggests the moribund character today of laws criminalizing this type of private, consensual conduct").

The sweeping references by Chief Justice Burger to the history of Western civilization and to Judeo-Christian moral and ethical standards did not take account of other authorities pointing in an opposite direction. A committee advising the British Parliament recommended in 1957 repeal of laws

punishing homosexual conduct. The Wolfenden Report: Report of the Committee on Homosexual Offenses and Prostitution (1963). Parliament enacted the substance of those recommendations 10 years later. Sexual Offences Act 1967, § 1.

Of even more importance, almost five years before *Bowers* was decided the European Court of Human Rights considered a case with parallels to *Bowers* and to today's case. An adult male resident in Northern Ireland alleged he was a practicing homosexual who desired to engage in consensual homosexual conduct. The laws of Northern Ireland forbade him that right. He alleged that he had been questioned, his home had been searched, and he feared criminal prosecution. The court held that the laws proscribing the conduct were invalid under the European Convention on Human Rights. *Dudgeon* v. *United Kingdom*, 45 Eur. Ct. H. R. (1981) ¶ 52. Authoritative in all countries that are members of the Council of Europe (21 nations then, 45 nations now), the decision is at odds with the premise in *Bowers* that the claim put forward was insubstantial in our Western civilization.

In our own constitutional system the deficiencies in *Bowers* became even more apparent in the years following its announcement. The 25 States with laws prohibiting the relevant conduct referenced in the *Bowers* decision are reduced now to 13, of which 4 enforce their laws only against homosexual conduct. In those States where sodomy is still proscribed, whether for same-sex or heterosexual conduct, there is a pattern of nonenforcement with respect to consenting adults acting in private. The State of Texas admitted in 1994 that as of that date it had not prosecuted anyone under those circumstances. *State* v. *Morales*, 869 S. W. 2d 941, 943.

Two principal cases decided after *Bowers* cast its holding into even more doubt. In *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), the Court reaffirmed the substantive force of the liberty protected by the Due Process Clause. The *Casey* decision again confirmed

that our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. *Id.*, at 851. In explaining the respect the Constitution demands for the autonomy of the person in making these choices, we stated as follows:

> "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State." *Ibid.*

Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do. The decision in *Bowers* would deny them this right.

The second post-*Bowers* case of principal relevance is *Romer* v. *Evans*, 517 U. S. 620 (1996). There the Court struck down class-based legislation directed at homosexuals as a violation of the Equal Protection Clause. *Romer* invalidated an amendment to Colorado's Constitution which named as a solitary class persons who were homosexuals, lesbians, or bisexual either by "orientation, conduct, practices or relationships," *id.*, at 624 (internal quotation marks omitted), and deprived them of protection under state antidiscrimination laws. We concluded that the provision was "born of animosity toward the class of persons affected" and further that it had no rational relation to a legitimate governmental purpose. *Id.*, at 634.

As an alternative argument in this case, counsel for the petitioners and some *amici* contend that *Romer* provides the basis for declaring the Texas statute invalid under the Equal Protection Clause. That is a tenable argument, but we con-

clude the instant case requires us to address whether *Bowers* itself has continuing validity. Were we to hold the statute invalid under the Equal Protection Clause some might question whether a prohibition would be valid if drawn differently, say, to prohibit the conduct both between same-sex and different-sex participants.

Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests. If protected conduct is made criminal and the law which does so remains unexamined for its substantive validity, its stigma might remain even if it were not enforceable as drawn for equal protection reasons. When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres. The central holding of *Bowers* has been brought in question by this case, and it should be addressed. Its continuance as precedent demeans the lives of homosexual persons.

The stigma this criminal statute imposes, moreover, is not trivial. The offense, to be sure, is but a class C misdemeanor, a minor offense in the Texas legal system. Still, it remains a criminal offense with all that imports for the dignity of the persons charged. The petitioners will bear on their record the history of their criminal convictions. Just this Term we rejected various challenges to state laws requiring the registration of sex offenders. *Smith* v. *Doe,* 538 U. S. 84 (2003); *Connecticut Dept. of Public Safety* v. *Doe,* 538 U. S. 1 (2003). We are advised that if Texas convicted an adult for private, consensual homosexual conduct under the statute here in question the convicted person would come within the registration laws of at least four States were he or she to be subject to their jurisdiction. Pet. for Cert. 13, and n. 12 (citing Idaho Code §§ 18–8301 to 18–8326 (Cum. Supp. 2002); La. Code Crim. Proc. Ann. §§ 15:540–15:549

(West 2003); Miss. Code Ann. §§ 45–33–21 to 45–33–57 (Lexis 2003); S. C. Code Ann. §§ 23–3–400 to 23–3–490 (West 2002)). This underscores the consequential nature of the punishment and the state-sponsored condemnation attendant to the criminal prohibition. Furthermore, the Texas criminal conviction carries with it the other collateral consequences always following a conviction, such as notations on job application forms, to mention but one example.

The foundations of *Bowers* have sustained serious erosion from our recent decisions in *Casey* and *Romer*. When our precedent has been thus weakened, criticism from other sources is of greater significance. In the United States criticism of *Bowers* has been substantial and continuing, disapproving of its reasoning in all respects, not just as to its historical assumptions. See, *e. g.,* C. Fried, Order and Law: Arguing the Reagan Revolution—A Firsthand Account 81–84 (1991); R. Posner, Sex and Reason 341–350 (1992). The courts of five different States have declined to follow it in interpreting provisions in their own state constitutions parallel to the Due Process Clause of the Fourteenth Amendment, see *Jegley* v. *Picado,* 349 Ark. 600, 80 S. W. 3d 332 (2002); *Powell* v. *State,* 270 Ga. 327, 510 S. E. 2d 18, 24 (1998); *Gryczan* v. *State,* 283 Mont. 433, 942 P. 2d 112 (1997); *Campbell* v. *Sundquist,* 926 S. W. 2d 250 (Tenn. App. 1996); *Commonwealth* v. *Wasson,* 842 S. W. 2d 487 (Ky. 1992).

To the extent *Bowers* relied on values we share with a wider civilization, it should be noted that the reasoning and holding in *Bowers* have been rejected elsewhere. The European Court of Human Rights has followed not *Bowers* but its own decision in *Dudgeon* v. *United Kingdom.* See *P. G. & J. H.* v. *United Kingdom,* App. No. 00044787/98, ¶ 56 (Eur. Ct. H. R., Sept. 25, 2001); *Modinos* v. *Cyprus,* 259 Eur. Ct. H. R. (1993); *Norris* v. *Ireland,* 142 Eur. Ct. H. R. (1988). Other nations, too, have taken action consistent with an affirmation of the protected right of homosexual adults to engage in intimate, consensual conduct. See Brief for Mary

Robinson et al. as *Amici Curiae* 11–12. The right the petitioners seek in this case has been accepted as an integral part of human freedom in many other countries. There has been no showing that in this country the governmental interest in circumscribing personal choice is somehow more legitimate or urgent.

The doctrine of *stare decisis* is essential to the respect accorded to the judgments of the Court and to the stability of the law. It is not, however, an inexorable command. *Payne* v. *Tennessee,* 501 U. S. 808, 828 (1991) ("*Stare decisis* is not an inexorable command; rather, it 'is a principle of policy and not a mechanical formula of adherence to the latest decision'" (quoting *Helvering* v. *Hallock,* 309 U. S. 106, 119 (1940))). In *Casey* we noted that when a court is asked to overrule a precedent recognizing a constitutional liberty interest, individual or societal reliance on the existence of that liberty cautions with particular strength against reversing course. 505 U. S., at 855–856; see also *id.,* at 844 ("Liberty finds no refuge in a jurisprudence of doubt"). The holding in *Bowers,* however, has not induced detrimental reliance comparable to some instances where recognized individual rights are involved. Indeed, there has been no individual or societal reliance on *Bowers* of the sort that could counsel against overturning its holding once there are compelling reasons to do so. *Bowers* itself causes uncertainty, for the precedents before and after its issuance contradict its central holding.

The rationale of *Bowers* does not withstand careful analysis. In his dissenting opinion in *Bowers* JUSTICE STEVENS came to these conclusions:

> "Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from consti-

tutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons." 478 U. S., at 216 (footnotes and citations omitted).

JUSTICE STEVENS' analysis, in our view, should have been controlling in *Bowers* and should control here.

*Bowers* was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. *Bowers* v. *Hardwick* should be and now is overruled.

The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Casey, supra,* at 847. The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

Had those who drew and ratified the Due Process Clauses of the Fifth Amendment or the Fourteenth Amendment known the components of liberty in its manifold possibilities, they might have been more specific. They did not presume

to have this insight. They knew times can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.

The judgment of the Court of Appeals for the Texas Fourteenth District is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, concurring in the judgment.

The Court today overrules *Bowers* v. *Hardwick*, 478 U. S. 186 (1986). I joined *Bowers,* and do not join the Court in overruling it. Nevertheless, I agree with the Court that Texas' statute banning same-sex sodomy is unconstitutional. See Tex. Penal Code Ann. § 21.06 (2003). Rather than relying on the substantive component of the Fourteenth Amendment's Due Process Clause, as the Court does, I base my conclusion on the Fourteenth Amendment's Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 439 (1985); see also *Plyler* v. *Doe,* 457 U. S. 202, 216 (1982). Under our rational basis standard of review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne* v. *Cleburne Living Center, supra,* at 440; see also *Department of Agriculture* v. *Moreno,* 413 U. S. 528, 534 (1973); *Romer* v. *Evans,* 517 U. S. 620, 632–633 (1996); *Nordlinger* v. *Hahn,* 505 U. S. 1, 11–12 (1992).

Laws such as economic or tax legislation that are scrutinized under rational basis review normally pass constitutional muster, since "the Constitution presumes that even improvident decisions will eventually be rectified by the

democratic processes." *Cleburne* v. *Cleburne Living Center, supra,* at 440; see also *Fitzgerald* v. *Racing Assn. of Central Iowa, ante,* p. 103; *Williamson* v. *Lee Optical of Okla., Inc.,* 348 U. S. 483 (1955). We have consistently held, however, that some objectives, such as "a bare . . . desire to harm a politically unpopular group," are not legitimate state interests. *Department of Agriculture* v. *Moreno, supra,* at 534. See also *Cleburne* v. *Cleburne Living Center, supra,* at 446–447; *Romer* v. *Evans, supra,* at 632. When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.

We have been most likely to apply rational basis review to hold a law unconstitutional under the Equal Protection Clause where, as here, the challenged legislation inhibits personal relationships. In *Department of Agriculture* v. *Moreno,* for example, we held that a law preventing those households containing an individual unrelated to any other member of the household from receiving food stamps violated equal protection because the purpose of the law was to " 'discriminate against hippies.' " 413 U. S., at 534. The asserted governmental interest in preventing food stamp fraud was not deemed sufficient to satisfy rational basis review. *Id.,* at 535–538. In *Eisenstadt* v. *Baird,* 405 U. S. 438, 447–455 (1972), we refused to sanction a law that discriminated between married and unmarried persons by prohibiting the distribution of contraceptives to single persons. Likewise, in *Cleburne* v. *Cleburne Living Center, supra,* we held that it was irrational for a State to require a home for the mentally disabled to obtain a special use permit when other residences—like fraternity houses and apartment buildings—did not have to obtain such a permit. And in *Romer* v. *Evans,* we disallowed a state statute that "impos[ed] a broad and undifferentiated disability on a single named group"—specifically, homosexuals. 517 U. S., at 632.

The statute at issue here makes sodomy a crime only if a person "engages in deviate sexual intercourse with another individual of the same sex." Tex. Penal Code Ann. § 21.06(a) (2003). Sodomy between opposite-sex partners, however, is not a crime in Texas. That is, Texas treats the same conduct differently based solely on the participants. Those harmed by this law are people who have a same-sex sexual orientation and thus are more likely to engage in behavior prohibited by § 21.06.

The Texas statute makes homosexuals unequal in the eyes of the law by making particular conduct—and only that conduct—subject to criminal sanction. It appears that prosecutions under Texas' sodomy law are rare. See *State* v. *Morales*, 869 S. W. 2d 941, 943 (Tex. 1994) (noting in 1994 that § 21.06 "has not been, and in all probability will not be, enforced against private consensual conduct between adults"). This case shows, however, that prosecutions under § 21.06 *do* occur. And while the penalty imposed on petitioners in this case was relatively minor, the consequences of conviction are not. It appears that petitioners' convictions, if upheld, would disqualify them from or restrict their ability to engage in a variety of professions, including medicine, athletic training, and interior design. See, *e. g.,* Tex. Occ. Code Ann. § 164.051(a)(2)(B) (2003 Pamphlet) (physician); § 451.251(a)(1) (athletic trainer); § 1053.252(2) (interior designer). Indeed, were petitioners to move to one of four States, their convictions would require them to register as sex offenders to local law enforcement. See, *e. g.,* Idaho Code § 18–8304 (Cum. Supp. 2002); La. Stat. Ann. § 15:542 (West Cum. Supp. 2003); Miss. Code Ann. § 45–33–25 (West 2003); S. C. Code Ann. § 23–3–430 (West Cum. Supp. 2002); cf. *ante,* at 575–576.

And the effect of Texas' sodomy law is not just limited to the threat of prosecution or consequence of conviction. Texas' sodomy law brands all homosexuals as criminals, thereby making it more difficult for homosexuals to be treated in the same manner as everyone else. Indeed, Texas

itself has previously acknowledged the collateral effects of the law, stipulating in a prior challenge to this action that the law "legally sanctions discrimination against [homosexuals] in a variety of ways unrelated to the criminal law," including in the areas of "employment, family issues, and housing." *State* v. *Morales*, 826 S. W. 2d 201, 203 (Tex. App. 1992).

Texas attempts to justify its law, and the effects of the law, by arguing that the statute satisfies rational basis review because it furthers the legitimate governmental interest of the promotion of morality. In *Bowers*, we held that a state law criminalizing sodomy as applied to homosexual couples did not violate substantive due process. We rejected the argument that no rational basis existed to justify the law, pointing to the government's interest in promoting morality. 478 U. S., at 196. The only question in front of the Court in *Bowers* was whether the substantive component of the Due Process Clause protected a right to engage in homosexual sodomy. *Id.*, at 188, n. 2. *Bowers* did not hold that moral disapproval of a group is a rational basis under the Equal Protection Clause to criminalize homosexual sodomy when heterosexual sodomy is not punished.

This case raises a different issue than *Bowers:* whether, under the Equal Protection Clause, moral disapproval is a legitimate state interest to justify by itself a statute that bans homosexual sodomy, but not heterosexual sodomy. It is not. Moral disapproval of this group, like a bare desire to harm the group, is an interest that is insufficient to satisfy rational basis review under the Equal Protection Clause. See, *e. g.*, *Department of Agriculture* v. *Moreno*, 413 U. S., at 534; *Romer* v. *Evans*, 517 U. S., at 634–635. Indeed, we have never held that moral disapproval, without any other asserted state interest, is a sufficient rationale under the Equal Protection Clause to justify a law that discriminates among groups of persons.

Moral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be "drawn for the purpose of disadvantaging the group burdened by the law." *Id.*, at 633. Texas' invocation of moral disapproval as a legitimate state interest proves nothing more than Texas' desire to criminalize homosexual sodomy. But the Equal Protection Clause prevents a State from creating "a classification of persons undertaken for its own sake." *Id.*, at 635. And because Texas so rarely enforces its sodomy law as applied to private, consensual acts, the law serves more as a statement of dislike and disapproval against homosexuals than as a tool to stop criminal behavior. The Texas sodomy law "raise[s] the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.*, at 634.

Texas argues, however, that the sodomy law does not discriminate against homosexual persons. Instead, the State maintains that the law discriminates only against homosexual conduct. While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, Texas' sodomy law is targeted at more than conduct. It is instead directed toward gay persons as a class. "After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal." *Id.*, at 641 (SCALIA, J., dissenting) (internal quotation marks omitted). When a State makes homosexual conduct criminal, and not "deviate sexual intercourse" committed by persons of different sexes, "that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." *Ante*, at 575.

Indeed, Texas law confirms that the sodomy statute is directed toward homosexuals as a class. In Texas, calling a person a homosexual is slander *per se* because the word "ho-

mosexual" "impute[s] the commission of a crime." *Plumley* v. *Landmark Chevrolet, Inc.,* 122 F. 3d 308, 310 (CA5 1997) (applying Texas law); see also *Head* v. *Newton,* 596 S. W. 2d 209, 210 (Tex. App. 1980). The State has admitted that because of the sodomy law, *being* homosexual carries the presumption of being a criminal. See *State* v. *Morales,* 826 S. W. 2d, at 202–203 ("[T]he statute brands lesbians and gay men as criminals and thereby legally sanctions discrimination against them in a variety of ways unrelated to the criminal law"). Texas' sodomy law therefore results in discrimination against homosexuals as a class in an array of areas outside the criminal law. See *ibid.* In *Romer* v. *Evans,* we refused to sanction a law that singled out homosexuals "for disfavored legal status." 517 U. S., at 633. The same is true here. The Equal Protection Clause "'neither knows nor tolerates classes among citizens.'" *Id.,* at 623 (quoting *Plessy* v. *Ferguson,* 163 U. S. 537, 559 (1896) (Harlan, J., dissenting)).

A State can of course assign certain consequences to a violation of its criminal law. But the State cannot single out one identifiable class of citizens for punishment that does not apply to everyone else, with moral disapproval as the only asserted state interest for the law. The Texas sodomy statute subjects homosexuals to "a lifelong penalty and stigma. A legislative classification that threatens the creation of an underclass . . . cannot be reconciled with" the Equal Protection Clause. *Plyler* v. *Doe,* 457 U. S., at 239 (Powell, J., concurring).

Whether a sodomy law that is neutral both in effect and application, see *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886), would violate the substantive component of the Due Process Clause is an issue that need not be decided today. I am confident, however, that so long as the Equal Protection Clause requires a sodomy law to apply equally to the private consensual conduct of homosexuals and heterosexuals alike, such a

law would not long stand in our democratic society. In the words of Justice Jackson:

> "The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106, 112–113 (1949) (concurring opinion).

That this law as applied to private, consensual conduct is unconstitutional under the Equal Protection Clause does not mean that other laws distinguishing between heterosexuals and homosexuals would similarly fail under rational basis review. Texas cannot assert any legitimate state interest here, such as national security or preserving the traditional institution of marriage. Unlike the moral disapproval of same-sex relations—the asserted state interest in this case— other reasons exist to promote the institution of marriage beyond mere moral disapproval of an excluded group.

A law branding one class of persons as criminal based solely on the State's moral disapproval of that class and the conduct associated with that class runs contrary to the values of the Constitution and the Equal Protection Clause, under any standard of review. I therefore concur in the Court's judgment that Texas' sodomy law banning "deviate sexual intercourse" between consenting adults of the same sex, but not between consenting adults of different sexes, is unconstitutional.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

"Liberty finds no refuge in a jurisprudence of doubt." *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U. S. 833, 844 (1992). That was the Court's sententious response, barely more than a decade ago, to those seeking to overrule *Roe v. Wade*, 410 U. S. 113 (1973). The Court's response today, to those who have engaged in a 17-year crusade to overrule *Bowers v. Hardwick*, 478 U. S. 186 (1986), is very different. The need for stability and certainty presents no barrier.

Most of the rest of today's opinion has no relevance to its actual holding—that the Texas statute "furthers no legitimate state interest which can justify" its application to petitioners under rational-basis review. *Ante*, at 578 (overruling *Bowers* to the extent it sustained Georgia's antisodomy statute under the rational-basis test). Though there is discussion of "fundamental proposition[s]," *ante*, at 565, and "fundamental decisions," *ibid.*, nowhere does the Court's opinion declare that homosexual sodomy is a "fundamental right" under the Due Process Clause; nor does it subject the Texas law to the standard of review that would be appropriate (strict scrutiny) if homosexual sodomy *were* a "fundamental right." Thus, while overruling the *outcome* of *Bowers*, the Court leaves strangely untouched its central legal conclusion: "[R]espondent would have us announce . . . a fundamental right to engage in homosexual sodomy. This we are quite unwilling to do." 478 U. S., at 191. Instead the Court simply describes petitioners' conduct as "an exercise of their liberty"—which it undoubtedly is—and proceeds to apply an unheard-of form of rational-basis review that will have far-reaching implications beyond this case. *Ante*, at 564.

## I

I begin with the Court's surprising readiness to reconsider a decision rendered a mere 17 years ago in *Bowers v. Hard-*

*wick.* I do not myself believe in rigid adherence to *stare decisis* in constitutional cases; but I do believe that we should be consistent rather than manipulative in invoking the doctrine. Today's opinions in support of reversal do not bother to distinguish—or indeed, even bother to mention— the paean to *stare decisis* coauthored by three Members of today's majority in *Planned Parenthood* v. *Casey.* There, when *stare decisis* meant preservation of judicially invented abortion rights, the widespread criticism of *Roe* was strong reason to *reaffirm* it:

> "Where, in the performance of its judicial duties, the Court decides a case in such a way as to resolve the sort of intensely divisive controversy reflected in *Roe*[,] . . . its decision has a dimension that the resolution of the normal case does not carry. . . . [T]o overrule under fire in the absence of the most compelling reason . . . would subvert the Court's legitimacy beyond any serious question." 505 U. S., at 866–867.

Today, however, the widespread opposition to *Bowers*, a decision resolving an issue as "intensely divisive" as the issue in *Roe*, is offered as a reason in favor of *overruling* it. See *ante*, at 576–577. Gone, too, is any "enquiry" (of the sort conducted in *Casey*) into whether the decision sought to be overruled has "proven 'unworkable,'" *Casey, supra*, at 855.

Today's approach to *stare decisis* invites us to overrule an erroneously decided precedent (including an "intensely divisive" decision) *if:* (1) its foundations have been "ero[ded]" by subsequent decisions, *ante*, at 576; (2) it has been subject to "substantial and continuing" criticism, *ibid.;* and (3) it has not induced "individual or societal reliance" that counsels against overturning, *ante*, at 577. The problem is that *Roe* itself—which today's majority surely has no disposition to overrule—satisfies these conditions to at least the same degree as *Bowers*.

(1) A preliminary digressive observation with regard to the first factor: The Court's claim that *Planned Parenthood* v. *Casey, supra,* "casts some doubt" upon the holding in *Bowers* (or any other case, for that matter) does not withstand analysis. *Ante,* at 571. As far as its holding is concerned, *Casey* provided a *less* expansive right to abortion than did *Roe, which was already on the books when Bowers was decided.* And if the Court is referring not to the holding of *Casey,* but to the dictum of its famed sweet-mystery-of-life passage, *ante,* at 574 ("'At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life'"): That "casts some doubt" upon either the totality of our jurisprudence or else (presumably the right answer) nothing at all. I have never heard of a law that attempted to restrict one's "right to define" certain concepts; and if the passage calls into question the government's power to regulate *actions based on* one's self-defined "concept of existence, etc.," it is the passage that ate the rule of law.

I do not quarrel with the Court's claim that *Romer* v. *Evans,* 517 U. S. 620 (1996), "eroded" the "foundations" of *Bowers'* rational-basis holding. See *Romer, supra,* at 640–643 (SCALIA, J., dissenting). But *Roe* and *Casey* have been equally "eroded" by *Washington* v. *Glucksberg,* 521 U. S. 702, 721 (1997), which held that *only* fundamental rights which are "'deeply rooted in this Nation's history and tradition'" qualify for anything other than rational-basis scrutiny under the doctrine of "substantive due process." *Roe* and *Casey,* of course, subjected the restriction of abortion to heightened scrutiny without even attempting to establish that the freedom to abort *was* rooted in this Nation's tradition.

(2) *Bowers,* the Court says, has been subject to "substantial and continuing [criticism], disapproving of its reasoning in all respects, not just as to its historical assumptions." *Ante,* at 576. Exactly what those nonhistorical criticisms are, and whether the Court even agrees with them, are left

unsaid, although the Court does cite two books. See *ibid.* (citing C. Fried, Order and Law: Arguing the Reagan Revolution—A Firsthand Account 81–84 (1991); R. Posner, Sex and Reason 341–350 (1992)).[1] Of course, *Roe* too (and by extension *Casey*) had been (and still is) subject to unrelenting criticism, including criticism from the two commentators cited by the Court today. See Fried, *supra,* at 75 ("Roe was a prime example of twisted judging"); Posner, *supra,* at 337 ("[The Court's] opinion in *Roe* . . . fails to measure up to professional expectations regarding judicial opinions"); Posner, Judicial Opinion Writing, 62 U. Chi. L. Rev. 1421, 1434 (1995) (describing the opinion in *Roe* as an "embarrassing performanc[e]").

(3) That leaves, to distinguish the rock-solid, unamendable disposition of *Roe* from the readily overrulable *Bowers,* only the third factor. "[T]here has been," the Court says, "no individual or societal reliance on *Bowers* of the sort that could counsel against overturning its holding . . . ." *Ante,* at 577. It seems to me that the "societal reliance" on the principles confirmed in *Bowers* and discarded today has been overwhelming. Countless judicial decisions and legislative enactments have relied on the ancient proposition that a governing majority's belief that certain sexual behavior is "immoral and unacceptable" constitutes a rational basis for regulation. See, *e. g., Williams* v. *Pryor,* 240 F. 3d 944, 949 (CA11 2001) (citing *Bowers* in upholding Alabama's prohibition on the sale of sex toys on the ground that "[t]he crafting and safeguarding of public morality . . . indisputably is a legitimate government interest under rational basis scrutiny"); *Milner* v. *Apfel,* 148 F. 3d 812, 814 (CA7 1998) (citing *Bowers* for the proposition that "[l]egislatures are permitted to legislate with regard to morality . . . rather than confined

---

[1] This last-cited critic of *Bowers* actually writes: "*[Bowers]* is correct nevertheless that the right to engage in homosexual acts is not deeply rooted in America's history and tradition." Posner, Sex and Reason, at 343.

to preventing demonstrable harms"); *Holmes* v. *California Army National Guard*, 124 F. 3d 1126, 1136 (CA9 1997) (relying on *Bowers* in upholding the federal statute and regulations banning from military service those who engage in homosexual conduct); *Owens* v. *State*, 352 Md. 663, 683, 724 A. 2d 43, 53 (1999) (relying on *Bowers* in holding that "a person has no constitutional right to engage in sexual intercourse, at least outside of marriage"); *Sherman* v. *Henry*, 928 S. W. 2d 464, 469–473 (Tex. 1996) (relying on *Bowers* in rejecting a claimed constitutional right to commit adultery). We ourselves relied extensively on *Bowers* when we concluded, in *Barnes* v. *Glen Theatre, Inc.*, 501 U. S. 560, 569 (1991), that Indiana's public indecency statute furthered "a substantial government interest in protecting order and morality," *ibid.* (plurality opinion); see also *id.*, at 575 (SCALIA, J., concurring in judgment). State laws against bigamy, same-sex marriage, adult incest, prostitution, masturbation, adultery, fornication, bestiality, and obscenity are likewise sustainable only in light of *Bowers'* validation of laws based on moral choices. Every single one of these laws is called into question by today's decision; the Court makes no effort to cabin the scope of its decision to exclude them from its holding. See *ante*, at 572 (noting "an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives *in matters pertaining to sex*" (emphasis added)). The impossibility of distinguishing homosexuality from other traditional "morals" offenses is precisely why *Bowers* rejected the rational-basis challenge. "The law," it said, "is constantly based on notions of morality, and if all laws representing essentially moral choices are to be invalidated under the Due Process Clause, the courts will be very busy indeed." 478 U. S., at 196.[2]

---

[2] While the Court does not overrule *Bowers'* holding that homosexual sodomy is not a "fundamental right," it is worth noting that the "societal reliance" upon that aspect of the decision has been substantial as well.

What a massive disruption of the current social order, therefore, the overruling of *Bowers* entails. Not so the overruling of *Roe*, which would simply have restored the regime that existed for centuries before 1973, in which the permissibility of, and restrictions upon, abortion were determined legislatively State by State. *Casey*, however, chose to base its *stare decisis* determination on a different "sort" of reliance. "[P]eople," it said, "have organized intimate relationships and made choices that define their views of themselves and their places in society, in reliance on the availability of abortion in the event that contraception should fail." 505 U. S., at 856. This falsely assumes that the consequence of overruling *Roe* would have been to make abortion unlawful. It would not; it would merely have *permitted*

---

See 10 U. S. C. § 654(b)(1) ("A member of the armed forces shall be separated from the armed forces . . . if . . . the member has engaged in . . . a homosexual act or acts"); *Marcum* v. *McWhorter*, 308 F. 3d 635, 640–642 (CA6 2002) (relying on *Bowers* in rejecting a claimed fundamental right to commit adultery); *Mullins* v. *Oregon*, 57 F. 3d 789, 793–794 (CA9 1995) (relying on *Bowers* in rejecting a grandparent's claimed "fundamental liberty interes[t]" in the adoption of her grandchildren); *Doe* v. *Wigginton*, 21 F. 3d 733, 739–740 (CA6 1994) (relying on *Bowers* in rejecting a prisoner's claimed "fundamental right" to on-demand HIV testing); *Schowengerdt* v. *United States*, 944 F. 2d 483, 490 (CA9 1991) (relying on *Bowers* in upholding a bisexual's discharge from the armed services); *Charles* v. *Baesler*, 910 F. 2d 1349, 1353 (CA6 1990) (relying on *Bowers* in rejecting fire department captain's claimed "fundamental" interest in a promotion); *Henne* v. *Wright*, 904 F. 2d 1208, 1214–1215 (CA8 1990) (relying on *Bowers* in rejecting a claim that state law restricting surnames that could be given to children at birth implicates a "fundamental right"); *Walls* v. *Petersburg*, 895 F. 2d 188, 193 (CA4 1990) (relying on *Bowers* in rejecting substantive-due-process challenge to a police department questionnaire that asked prospective employees about homosexual activity); *High Tech Gays* v. *Defense Industrial Security Clearance Office*, 895 F. 2d 563, 570–571 (CA9 1988) (relying on *Bowers*' holding that homosexual activity is not a fundamental right in rejecting—on the basis of the rational-basis standard—an equal-protection challenge to the Defense Department's policy of conducting expanded investigations into backgrounds of gay and lesbian applicants for secret and top-secret security clearances).

the States to do so. Many States would unquestionably have declined to prohibit abortion, and others would not have prohibited it within six months (after which the most significant reliance interests would have expired). Even for persons in States other than these, the choice would not have been between abortion and childbirth, but between abortion nearby and abortion in a neighboring State.

To tell the truth, it does not surprise me, and should surprise no one, that the Court has chosen today to revise the standards of *stare decisis* set forth in *Casey*. It has thereby exposed *Casey*'s extraordinary deference to precedent for the result-oriented expedient that it is.

## II

Having decided that it need not adhere to *stare decisis*, the Court still must establish that *Bowers* was wrongly decided and that the Texas statute, as applied to petitioners, is unconstitutional.

Texas Penal Code Ann. § 21.06(a) (2003) undoubtedly imposes constraints on liberty. So do laws prohibiting prostitution, recreational use of heroin, and, for that matter, working more than 60 hours per week in a bakery. But there is no right to "liberty" under the Due Process Clause, though today's opinion repeatedly makes that claim. *Ante*, at 567 ("The liberty protected by the Constitution allows homosexual persons the right to make this choice"); *ante*, at 574 ("'These matters . . . are central to the liberty protected by the Fourteenth Amendment'"); *ante*, at 578 ("Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government"). The Fourteenth Amendment *expressly allows* States to deprive their citizens of "liberty," *so long as "due process of law" is provided:*

> "No state shall . . . deprive any person of life, liberty, or property, *without due process of law.*" Amdt. 14 (emphasis added).

Our opinions applying the doctrine known as "substantive due process" hold that the Due Process Clause prohibits States from infringing *fundamental* liberty interests, unless the infringement is narrowly tailored to serve a compelling state interest. *Washington* v. *Glucksberg,* 521 U. S., at 721. We have held repeatedly, in cases the Court today does not overrule, that *only* fundamental rights qualify for this so-called "heightened scrutiny" protection—that is, rights which are " 'deeply rooted in this Nation's history and tradition,' " *ibid.* See *Reno* v. *Flores,* 507 U. S. 292, 303 (1993) (fundamental liberty interests must be "so rooted in the traditions and conscience of our people as to be ranked as fundamental" (internal quotation marks and citations omitted)); *United States* v. *Salerno,* 481 U. S. 739, 751 (1987) (same). See also *Michael H.* v. *Gerald D.,* 491 U. S. 110, 122 (1989) ("[W]e have insisted not merely that the interest denominated as a 'liberty' be 'fundamental' . . . but also that it be an interest traditionally protected by our society"); *Moore* v. *East Cleveland,* 431 U. S. 494, 503 (1977) (plurality opinion); *Meyer* v. *Nebraska,* 262 U. S. 390, 399 (1923) (Fourteenth Amendment protects "those privileges *long recognized. at common law* as essential to the orderly pursuit of happiness by free men" (emphasis added)).[3] All other liberty interests may be abridged or abrogated pursuant to a validly enacted state law if that law is rationally related to a legitimate state interest.

_____

[3] The Court is quite right that " '[h]istory and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry,' " *ante,* at 572. An asserted "fundamental liberty interest" must not only be " 'deeply rooted in this Nation's history and tradition,' " *Washington* v. *Glucksberg,* 521 U. S. 702, 721 (1997), but it must *also* be " 'implicit in the concept of ordered liberty,' " so that " 'neither liberty nor justice would exist if [it] were sacrificed,' " *ibid.* Moreover, liberty interests unsupported by history and tradition, though not deserving of "heightened scrutiny," are *still* protected from state laws that are not rationally related to any legitimate state interest. *Id.,* at 722. As I proceed to discuss, it is this latter principle that the Court applies in the present case.

*Bowers* held, first, that criminal prohibitions of homosexual sodomy are not subject to heightened scrutiny because they do not implicate a "fundamental right" under the Due Process Clause, 478 U. S., at 191–194. Noting that "[p]roscriptions against that conduct have ancient roots," *id.*, at 192, that "[s]odomy was a criminal offense at common law and was forbidden by the laws of the original 13 States when they ratified the Bill of Rights," *ibid.*, and that many States had retained their bans on sodomy, *id.*, at 193, *Bowers* concluded that a right to engage in homosexual sodomy was not "'deeply rooted in this Nation's history and tradition,'" *id.*, at 192.

The Court today does not overrule this holding. Not once does it describe homosexual sodomy as a "fundamental right" or a "fundamental liberty interest," nor does it subject the Texas statute to strict scrutiny. Instead, having failed to establish that the right to homosexual sodomy is "'deeply rooted in this Nation's history and tradition,'" the Court concludes that the application of Texas's statute to petitioners' conduct fails the rational-basis test, and overrules *Bowers'* holding to the contrary, see *id.*, at 196. "The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." *Ante*, at 578.

I shall address that rational-basis holding presently. First, however, I address some aspersions that the Court casts upon *Bowers'* conclusion that homosexual sodomy is not a "fundamental right"—even though, as I have said, the Court does not have the boldness to reverse that conclusion.

### III

The Court's description of "the state of the law" at the time of *Bowers* only confirms that *Bowers* was right. *Ante*, at 566. The Court points to *Griswold* v. *Connecticut*, 381 U. S. 479, 481–482 (1965). But that case *expressly disclaimed* any reliance on the doctrine of "substantive due

process," and grounded the so-called "right to privacy" in penumbras of constitutional provisions *other than* the Due Process Clause. *Eisenstadt* v. *Baird*, 405 U. S. 438 (1972), likewise had nothing to do with "substantive due process"; it invalidated a Massachusetts law prohibiting the distribution of contraceptives to unmarried persons solely on the basis of the Equal Protection Clause. Of course *Eisenstadt* contains well-known dictum relating to the "right to privacy," but this referred to the right recognized in *Griswold*—a right penumbral to the *specific* guarantees in the Bill of Rights, and not a "substantive due process" right.

*Roe* v. *Wade* recognized that the right to abort an unborn child was a "fundamental right" protected by the Due Process Clause. 410 U. S., at 155. The *Roe* Court, however, made no attempt to establish that this right was " 'deeply rooted in this Nation's history and tradition' "; instead, it based its conclusion that "the Fourteenth Amendment's concept of personal liberty . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy" on its own normative judgment that antiabortion laws were undesirable. See *id.,* at 153. We have since rejected *Roe*'s holding that regulations of abortion must be narrowly tailored to serve a compelling state interest, see *Planned Parenthood* v. *Casey,* 505 U. S., at 876 (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.); *id.,* at 951–953 (REHNQUIST, C. J., concurring in judgment in part and dissenting in part)—and thus, by logical implication, *Roe*'s holding that the right to abort an unborn child is a "fundamental right." See 505 U. S., at 843–912 (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.) (not once describing abortion as a "fundamental right" or a "fundamental liberty interest").

After discussing the history of antisodomy laws, *ante,* at 568–571, the Court proclaims that, "it should be noted that there is no longstanding history in this country of laws directed at homosexual conduct as a distinct matter," *ante,*

at 568. This observation in no way casts into doubt the "definitive [historical] conclusio[n]," *ibid.*, on which *Bowers* relied: that our Nation has a longstanding history of laws prohibiting *sodomy in general*—regardless of whether it was performed by same-sex or opposite-sex couples:

> "It is obvious to us that neither of these formulations would extend a fundamental right to homosexuals to engage in acts of consensual sodomy. Proscriptions against that conduct have ancient roots. *Sodomy* was a criminal offense at common law and was forbidden by the laws of the original 13 States when they ratified the Bill of Rights. In 1868, when the Fourteenth Amendment was ratified, all but 5 of the 37 States in the Union had *criminal sodomy laws*. In fact, until 1961, all 50 States outlawed *sodomy*, and today, 24 States and the District of Columbia continue to provide criminal penalties for *sodomy* performed in private and between consenting adults. Against this background, to claim that a right to engage in such conduct is 'deeply rooted in this Nation's history and tradition' or 'implicit in the concept of ordered liberty' is, at best, facetious." 478 U. S., at 192–194 (citations and footnotes omitted; emphasis added).

It is (as *Bowers* recognized) entirely irrelevant whether the laws in our long national tradition criminalizing homosexual sodomy were "directed at homosexual conduct as a distinct matter." *Ante*, at 568. Whether homosexual sodomy was prohibited by a law targeted at same-sex sexual relations or by a more general law prohibiting both homosexual and heterosexual sodomy, the only relevant point is that it *was* criminalized—which suffices to establish that homosexual sodomy is not a right "deeply rooted in our Nation's history and tradition." The Court today agrees that homosexual sodomy was criminalized and thus does not dispute the facts on which *Bowers actually* relied.

Next the Court makes the claim, again unsupported by any citations, that "[l]aws prohibiting sodomy do not seem to have been enforced against consenting adults acting in private." *Ante*, at 569. The key qualifier here is "acting in private"—since the Court admits that sodomy laws *were* enforced against consenting adults (although the Court contends that prosecutions were "infrequen[t]," *ibid.*). I do not know what "acting in private" means; surely consensual sodomy, like heterosexual intercourse, is rarely performed on stage. If all the Court means by "acting in private" is "on private premises, with the doors closed and windows covered," it is entirely unsurprising that evidence of enforcement would be hard to come by. (Imagine the circumstances that would enable a search warrant to be obtained for a residence on the ground that there was probable cause to believe that consensual sodomy was then and there occurring.) Surely that lack of evidence would not sustain the proposition that consensual sodomy on private premises with the doors closed and windows covered was regarded as a "fundamental right," even though all other consensual sodomy was criminalized. There are 203 prosecutions for consensual, adult homosexual sodomy reported in the West Reporting system and official state reporters from the years 1880–1995. See W. Eskridge, Gaylaw: Challenging the Apartheid of the Closet 375 (1999) (hereinafter Gaylaw). There are also records of 20 sodomy prosecutions and 4 executions during the colonial period. J. Katz, Gay/Lesbian Almanac 29, 58, 663 (1983). *Bowers'* conclusion that homosexual sodomy is not a fundamental right "deeply rooted in this Nation's history and tradition" is utterly unassailable.

Realizing that fact, the Court instead says: "[W]e think that our laws and traditions in the past half century are of most relevance here. These references show *an emerging awareness* that liberty gives substantial protection to adult persons in deciding how to conduct their private lives *in matters pertaining to sex*." *Ante*, at 571–572 (emphasis

added). Apart from the fact that such an "emerging awareness" does not establish a "fundamental right," the statement is factually false. States continue to prosecute all sorts of crimes by adults "in matters pertaining to sex": prostitution, adult incest, adultery, obscenity, and child pornography. Sodomy laws, too, have been enforced "in the past half century," in which there have been 134 reported cases involving prosecutions for consensual, adult, homosexual sodomy. Gaylaw 375. In relying, for evidence of an "emerging recognition," upon the American Law Institute's 1955 recommendation not to criminalize "'consensual sexual relations conducted in private,'" *ante*, at 572, the Court ignores the fact that this recommendation was "a point of resistance in most of the states that considered adopting the Model Penal Code." Gaylaw 159.

In any event, an "emerging awareness" is by definition not "deeply rooted in this Nation's history and tradition[s]," as we have said "fundamental right" status requires. Constitutional entitlements do not spring into existence because some States choose to lessen or eliminate criminal sanctions on certain behavior. Much less do they spring into existence, as the Court seems to believe, because *foreign nations* decriminalize conduct. The *Bowers* majority opinion *never* relied on "values we share with a wider civilization," *ante*, at 576, but rather rejected the claimed right to sodomy on the ground that such a right was not "'deeply rooted in *this Nation's* history and tradition,'" 478 U. S., at 193–194 (emphasis added). *Bowers'* rational-basis holding is likewise devoid of any reliance on the views of a "wider civilization," see *id.*, at 196. The Court's discussion of these foreign views (ignoring, of course, the many countries that have retained criminal prohibitions on sodomy) is therefore meaningless dicta. Dangerous dicta, however, since "this Court . . . should not impose foreign moods, fads, or fashions on Americans." *Foster* v. *Florida*, 537 U. S. 990, n. (2002) (THOMAS, J., concurring in denial of certiorari).

## IV

I turn now to the ground on which the Court squarely rests its holding: the contention that there is no rational basis for the law here under attack. This proposition is so out of accord with our jurisprudence—indeed, with the jurisprudence of *any* society we know—that it requires little discussion.

The Texas statute undeniably seeks to further the belief of its citizens that certain forms of sexual behavior are "immoral and unacceptable," *Bowers, supra,* at 196—the same interest furthered by criminal laws against fornication, bigamy, adultery, adult incest, bestiality, and obscenity. *Bowers* held that this *was* a legitimate state interest. The Court today reaches the opposite conclusion. The Texas statute, it says, "furthers *no legitimate state interest* which can justify its intrusion into the personal and private life of the individual," *ante,* at 578 (emphasis added). The Court embraces instead JUSTICE STEVENS' declaration in his *Bowers* dissent, that "'the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice,'" *ante,* at 577. This effectively decrees the end of all morals legislation. If, as the Court asserts, the promotion of majoritarian sexual morality is not even a *legitimate* state interest, none of the above-mentioned laws can survive rational-basis review.

## V

Finally, I turn to petitioners' equal-protection challenge, which no Member of the Court save JUSTICE O'CONNOR, *ante,* at 579 (opinion concurring in judgment), embraces: On its face § 21.06(a) applies equally to all persons. Men and women, heterosexuals and homosexuals, are all subject to its prohibition of deviate sexual intercourse with someone of the same sex. To be sure, § 21.06 does distinguish between the sexes insofar as concerns the partner with whom the sexual

acts are performed: men can violate the law only with other men, and women only with other women. But this cannot itself be a denial of equal protection, since it is precisely the same distinction regarding partner that is drawn in state laws prohibiting marriage with someone of the same sex while permitting marriage with someone of the opposite sex.

The objection is made, however, that the antimiscegenation laws invalidated in *Loving* v. *Virginia*, 388 U. S. 1, 8 (1967), similarly were applicable to whites and blacks alike, and only distinguished between the races insofar as the *partner* was concerned. In *Loving*, however, we correctly applied heightened scrutiny, rather than the usual rational-basis review, because the Virginia statute was "designed to maintain White Supremacy." *Id.*, at 6, 11. A racially discriminatory purpose is always sufficient to subject a law to strict scrutiny, even a facially neutral law that makes no mention of race. See *Washington* v. *Davis*, 426 U. S. 229, 241–242 (1976). No purpose to discriminate against men or women as a class can be gleaned from the Texas law, so rational-basis review applies. That review is readily satisfied here by the same rational basis that satisfied it in *Bowers*—society's belief that certain forms of sexual behavior are "immoral and unacceptable," 478 U. S., at 196. This is the same justification that supports many other laws regulating sexual behavior that make a distinction based upon the identity of the partner—for example, laws against adultery, fornication, and adult incest, and laws refusing to recognize homosexual marriage.

JUSTICE O'CONNOR argues that the discrimination in this law which must be justified is not its discrimination with regard to the sex of the partner but its discrimination with regard to the sexual proclivity of the principal actor.

"While it is true that the law applies only to conduct, the conduct targeted by this law is conduct that is closely correlated with being homosexual. Under such circumstances, Texas' sodomy law is targeted at more than con-

duct. It is instead directed toward gay persons as a class." *Ante,* at 583.

Of course the same could be said of any law. A law against public nudity targets "the conduct that is closely correlated with being a nudist," and hence "is targeted at more than conduct"; it is "directed toward nudists as a class." But be that as it may. Even if the Texas law *does* deny equal protection to "homosexuals as a class," that denial *still* does not need to be justified by anything more than a rational basis, which our cases show is satisfied by the enforcement of traditional notions of sexual morality.

JUSTICE O'CONNOR simply decrees application of "a more searching form of rational basis review" to the Texas statute. *Ante,* at 580. The cases she cites do not recognize such a standard, and reach their conclusions only after finding, as required by conventional rational-basis analysis, that no conceivable legitimate state interest supports the classification at issue. See *Romer* v. *Evans,* 517 U. S., at 635; *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 448–450 (1985); *Department of Agriculture* v. *Moreno,* 413 U. S. 528, 534–538 (1973). Nor does JUSTICE O'CONNOR explain precisely what her "more searching form" of rational-basis review consists of. It must at least mean, however, that laws exhibiting "a desire to harm a politically unpopular group," *ante,* at 580, are invalid *even though* there may be a conceivable rational basis to support them.

This reasoning leaves on pretty shaky grounds state laws limiting marriage to opposite-sex couples. JUSTICE O'CONNOR seeks to preserve them by the conclusory statement that "preserving the traditional institution of marriage" is a legitimate state interest. *Ante,* at 585. But "preserving the traditional institution of marriage" is just a kinder way of describing the State's *moral disapproval* of same-sex couples. Texas's interest in § 21.06 could be recast in similarly euphemistic terms: "preserving the traditional sexual mores of our society." In the jurisprudence JUSTICE O'CONNOR

has seemingly created, judges can validate laws by characterizing them as "preserving the traditions of society" (good); or invalidate them by characterizing them as "expressing moral disapproval" (bad).

* * *

Today's opinion is the product of a Court, which is the product of a law-profession culture, that has largely signed on to the so-called homosexual agenda, by which I mean the agenda promoted by some homosexual activists directed at eliminating the moral opprobrium that has traditionally attached to homosexual conduct. I noted in an earlier opinion the fact that the American Association of Law Schools (to which any reputable law school *must* seek to belong) excludes from membership any school that refuses to ban from its job-interview facilities a law firm (no matter how small) that does not wish to hire as a prospective partner a person who openly engages in homosexual conduct. See *Romer, supra,* at 653.

One of the most revealing statements in today's opinion is the Court's grim warning that the criminalization of homosexual conduct is "an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." *Ante,* at 575. It is clear from this that the Court has taken sides in the culture war, departing from its role of assuring, as neutral observer, that the democratic rules of engagement are observed. Many Americans do not want persons who openly engage in homosexual conduct as partners in their business, as scoutmasters for their children, as teachers in their children's schools, or as boarders in their home. They view this as protecting themselves and their families from a lifestyle that they believe to be immoral and destructive. The Court views it as "discrimination" which it is the function of our judgments to deter. So imbued is the Court with the law profession's anti-anti-homosexual culture, that it is seemingly unaware that the attitudes of that

culture are not obviously "mainstream"; that in most States what the Court calls "discrimination" against those who engage in homosexual acts is perfectly legal; that proposals to ban such "discrimination" under Title VII have repeatedly béen rejected by Congress, see Employment Non-Discrimination Act of 1994, S. 2238, 103d Cong., 2d Sess. (1994); Civil Rights Amendments, H. R. 5452, 94th Cong., 1st Sess. (1975); that in some cases such "discrimination" is *mandated* by federal statute, see 10 U. S. C. § 654(b)(1) (mandating discharge from the Armed Forces of any service member who engages in or intends to engage in homosexual acts); and that in some cases such "discrimination" is a constitutional right, see *Boy Scouts of America* v. *Dale,* 530 U. S. 640 (2000).

Let me be clear that I have nothing against homosexuals, or any other group, promoting their agenda through normal democratic means. Social perceptions of sexual and other morality change over time, and every group has the right to persuade its fellow citizens that its view of such matters is the best. That homosexuals have achieved some success in that enterprise is attested to by the fact that Texas is one of the few remaining States that criminalize private, consensual homosexual acts. But persuading one's fellow citizens is one thing, and imposing one's views in absence of democratic majority will is something else. I would no more *require* a State to criminalize homosexual acts—or, for that matter, display *any* moral disapprobation of them—than I would *forbid* it to do so. What Texas has chosen to do is well within the range of traditional democratic action, and its hand should not be stayed through the invention of a brand-new "constitutional right" by a Court that is impatient of democratic change. It is indeed true that "later generations can see that laws once thought necessary and proper in fact serve only to oppress," *ante,* at 579; and when that happens, later generations can repeal those laws. But it is the premise of our system that those judgments are to be made

by the people, and not imposed by a governing caste that knows best.

One of the benefits of leaving regulation of this matter to the people rather than to the courts is that the people, unlike judges, need not carry things to their logical conclusion. The people may feel that their disapprobation of homosexual conduct is strong enough to disallow homosexual marriage, but not strong enough to criminalize private homosexual acts—and may legislate accordingly. The Court today pretends that it possesses a similar freedom of action, so that we need not fear judicial imposition of homosexual marriage, as has recently occurred in Canada (in a decision that the Canadian Government has chosen not to appeal). See *Halpern* v. *Toronto*, 2003 WL 34950 (Ontario Ct. App.); Cohen, Dozens in Canada Follow Gay Couple's Lead, Washington Post, June 12, 2003, p. A25. At the end of its opinion—after having laid waste the foundations of our rational-basis jurisprudence—the Court says that the present case "does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Ante*, at 578. Do not believe it. More illuminating than this bald, unreasoned disclaimer is the progression of thought displayed by an earlier passage in the Court's opinion, which notes the constitutional protections afforded to "personal decisions relating to *marriage*, procreation, contraception, family relationships, child rearing, and education," and then declares that "[p]ersons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." *Ante*, at 574 (emphasis added). Today's opinion dismantles the structure of constitutional law that has permitted a distinction to be made between heterosexual and homosexual unions, insofar as formal recognition in marriage is concerned. If moral disapprobation of homosexual conduct is "no legitimate state interest" for purposes of proscribing that conduct, *ante*, at 578; and if, as the Court coos (casting aside all pretense of neutrality), "[w]hen

sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring," *ante*, at 567; what justification could there possibly be for denying the benefits of marriage to homosexual couples exercising "[t]he liberty protected by the Constitution," *ibid.?* Surely not the encouragement of procreation, since the sterile and the elderly are allowed to marry. This case "does not involve" the issue of homosexual marriage only if one entertains the belief that principle and logic have nothing to do with the decisions of this Court. Many will hope that, as the Court comfortingly assures us, this is so.

The matters appropriate for this Court's resolution are only three: Texas's prohibition of sodomy neither infringes a "fundamental right" (which the Court does not dispute), nor is unsupported by a rational relation to what the Constitution considers a legitimate state interest, nor denies the equal protection of the laws. I dissent.

JUSTICE THOMAS, dissenting.

I join JUSTICE SCALIA's dissenting opinion. I write separately to note that the law before the Court today "is . . . uncommonly silly." *Griswold* v. *Connecticut*, 381 U. S. 479, 527 (1965) (Stewart, J., dissenting). If I were a member of the Texas Legislature, I would vote to repeal it. Punishing someone for expressing his sexual preference through noncommercial consensual conduct with another adult does not appear to be a worthy way to expend valuable law enforcement resources.

Notwithstanding this, I recognize that as a Member of this Court I am not empowered to help petitioners and others similarly situated. My duty, rather, is to "decide cases 'agreeably to the Constitution and laws of the United States.'" *Id.*, at 530. And, just like Justice Stewart, I "can find [neither in the Bill of Rights nor any other part of the

Constitution a] general right of privacy," *ibid.*, or as the Court terms it today, the "liberty of the person both in its spatial and more transcendent dimensions," *ante*, at 562.