Filed 4/15/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL RUBEN McEVOY,<br><br>    Defendant and Appellant. | A132360<br><br>(Contra Costa County<br>Super. Ct. No. 5-100933-1) |

Daniel McEvoy appeals from convictions of incest and assault arising from a sexual encounter with his sister. He challenges the constitutionality of California's incest statute as violating his due process rights by criminalizing consensual sexual conduct between adults. We affirm.

**STATEMENT OF THE CASE**

Appellant was charged by information filed on August 20, 2010, with incest (Pen. Code, § 285—count one)[1], oral copulation of an unconscious person (§ 288a, subd. (f)—count two), sexual penetration of an unconscious person (§ 289, subd. (d)—count three), attempted rape by use of drugs (§§ 261, subd. (a)(4)/664—count four), and assault with attempt to commit rape (§ 220, subd. (a)—count five). It was alleged that appellant had suffered a prior serious felony conviction (§§ 667, subds. (b)–(i), 1170.12) and had served a prior prison term for a different felony offense (§ 667.5, subd. (b)), and that he was ineligible for probation due to these and other felony convictions (§ 1203, subd. (e)(4)).

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

1

Jury trial began on April 27, 2011. On May 6, the prosecutor filed an amended information seeking to charge forcible rape (§ 261, subd. (a)(2)) instead of the section 289, subdivision (d) violation in count three and altering the language of count four to charge attempted rape of an unconscious person. The court denied the motion to amend count three, finding that although the evidence was sufficient to submit the amended charge to the jury, appellant would be prejudiced by the amendment. The motion to amend count four was granted. Count three was subsequently dismissed under section 1118, with the agreement of the parties.

On May 11, the jury found appellant guilty of incest and of simple assault (§ 240), a lesser offense under count five. The jury found appellant not guilty of oral copulation of an unconscious person or the lesser offense of attempted oral copulation, not guilty of attempted rape of an unconscious person, and not guilty of assault with intent to rape.

On June 6, the court found the alleged strike and prior convictions true. On June 8, appellant was sentenced to a total prison term of two years eight months: the mitigated term of one year four months, doubled to two years eight months, on count one. A six-month sentence on count two was stayed pursuant to section 654.

Appellant filed a timely notice of appeal on June 9, 2011.

### STATEMENT OF FACTS

Appellant is Jane Doe's brother, older by slightly less than two years. They have two other brothers and a sister. Growing up, Doe was closest to appellant, whom she felt was her protector against an abusive father and uncle.

In August 2008, Jane Doe was living in a three-bedroom house in Oakley with Michael C. (Michael) and their three children, all under 10 years of age. Michael and Doe had been together since 1999; their relationship ended in October of 2010. Doe's then 17-year-old son (Son) was also living with them.

On August 5, 2008, appellant was staying with Doe and her family. Michael was trying to help appellant get a job with Michael's then-employer, and Doe and appellant were reminiscing and catching up after not having seen each other for a couple of years.

2

That evening, Michael did not notice anything unusual about Doe and appellant's interaction. Neither he nor Doe saw any of the adults drinking beer, Michael did not see any of them smoking marijuana, and Doe did not smoke any methamphetamine. At some point, appellant braided Doe's hair, volunteering to do so after Doe asked Son to do it and he did not want to. This seemed "normal" to Doe, as appellant was her "best friend" and brother.

Doe and appellant stayed up talking after Michael and the children went to bed in the master bedroom. At some point, Doe felt a migraine coming on and took a Vicodin, the prescription medication she used to treat migraines that she suffered due to a head injury sustained in a 2007 car crash. She decided to go to sleep in one of the two beds in her sons' room and appellant went to sleep in the other bed. Doe did not see anything wrong with this; they were still talking and appellant was her brother.

Doe, who had been sleeping under the blankets, woke up feeling someone's tongue on her vagina. At first, Doe thought it was Michael, but she realized it was appellant when he tried to kiss her lips, asked her to kiss him, said he loved her and whispered, "we were meant to be. We are soulmates. We will always be together." Scared, Doe kept her eyes closed and "froze." Appellant pulled down her underwear and penetrated her vagina with his penis. She pretended to be asleep. Doe was afraid there might be violence between Michael and appellant, and did not want her children to see their father beating up their uncle and hear them talk about what happened. When appellant was "done," he pulled Doe's underwear up, pulled her pajamas down and covered her. She heard him unlock the bedroom door and lie down.

When Doe woke in the morning, she felt "lost." She testified, "I felt like my whole life was make believe. I thought it was brother/sister love. I just . . . I was just lost. I just wish it wasn't what it was." Michael came into the room to wake her and she went with him into the master bedroom and asked him to wake appellant and take him to work. She did not tell Michael what had happened because the children were there, but

3

she wanted appellant out of the house: "I wanted him out of my house. I didn't want to see him or even look at him. Or even smell him."

At the time of trial, Doe testified, "I have a lot of hate. I . . . I . . . have come to make myself just understand, try to understand why it was what it was but I can't so I have no brother. I have no brother. And that's what I will make myself believe in order to deal with what I have to deal with." She denied offering appellant a head massage or asking him to lie on the bed with her in her sons' room. Doe acknowledged that her relationship with Michael involved domestic violence. Doe had suffered a misdemeanor conviction in 2009 for petty theft.[2]

Michael testified that when he went in to wake Doe on the morning of August 6, he noticed from her facial expression that something was wrong. She looked frightened and was very emotional; she would not tell him what was wrong, but kept telling him to get appellant out of the house. Michael took appellant with him to work. After he left, Doe told Son what had happened. Son called Michael at work and told him Doe had said appellant raped her. In disbelief and then anger, Michael confronted appellant, who denied the accusation. Michael physically restrained appellant and started to call the police, appellant tried to talk him out of it, then Michael's boss opened the door to the room they were in and appellant ran out. Appellant got a co-worker who was on his way to lunch to drive him to BART. Michael followed in his own car, but when he was running after appellant in the terminal he was stopped by BART police. They radioed to try to stop appellant, but it was too late.

Michael acknowledged that he had been arrested in the past for domestic violence against Doe, and had been convicted of violating domestic violence restraining orders in 1998 and 2001. The police were called to Michael and Doe's house a month after the present incident for another domestic dispute. In January 2008, Michael applied for a

---

[2] By the trial court's characterization, Doe was very emotional on the stand, "weeping throughout," having difficulty speaking and on at least one occasion vomiting.

restraining order against Doe, saying in his supporting statement that Doe had made many false police reports.

Michael testified that the medication Doe took for her migraines "really put her down," leaving her "incoherent," not aware of what she was doing and "asleep."

Police Officer William Koerner arrived at Doe's house soon after 12:30 p.m. on August 6. Doe was in the driveway, her eyes red and puffy, and visibly distraught. Koerner spoke with Doe for approximately an hour, during which time she had to stop several times to compose herself and a few times broke down crying. She did not appear angry or vindictive. Neither Koerner nor Sergeant Craig Brooks, both of whom qualified as experts on recognizing the signs of a person being under the influence of methamphetamine, saw any signs of Doe being under the influence of methamphetamine.

Koerner testified that Doe told him she initially thought it was Michael in bed with her because the dog who was at the foot of the bed was not growling and the dog only growled at appellant, and also because Michael knew her menstrual cycle was over. The officer also testified that Doe told him she did not call for help during the incident with appellant because she thought there might be violence between appellant and Michael and one might hurt or kill the other, but she did not mention anything about not wanting her children to see violence or find out what had happened. Nor did she mention hearing a door unlock when appellant moved into the other bed.

Doe underwent a sexual assault examination the day after the incident. DNA testing of sperm found on a vaginal smear taken from Doe's vagina determined that the contributor was appellant. Michael and Son were ruled out as possible contributors. The condition of the sperm indicated it had been deposited within 12 to 16 hours of the examination.

Detective Antonio Benavides, testifying as an expert on victims' responses to sexual assault, stated that there is no single typical response. Benavides testified that it is not inconsistent with sexual abuse for a victim to "play dead" or experience "numbing fear." Some victims resist their attackers, others do not. During an assault and over time

5

afterward, victims might experience diminished alertness, numbness, nausea, vomiting, hysteria, confusion or crying. Often victims will give a "bare bones" account when they first report an assault, then gradually disclose more as they develop a rapport with the investigating officer. Certain questions are more helpful than others, and an interviewer less well trained in this area may pose questions in a way that does not elicit the full story.

When Benavides first spoke with Doe on August 11, on the telephone, she was very emotional and crying. Benavides remained in contact with Doe during the two years following the incident. She expressed to him on numerous occasions that she was afraid of her children finding out what happened because she did not want to "interrupt what she calls their innocent minds," and that on the night of the incident she was afraid of her children witnessing violence as a result of the incident.

**Defense**

Appellant testified that on August 5, 2008, he, Doe and Michael smoked marijuana together in the car on the way to Doe's house, and once there continued to smoke and drink beer. They smoked "a lot" of marijuana and appellant drank three or four beers. Later, they were watching television and talking in the living room with the children, and Doe asked appellant to braid her hair. Michael went into the master bedroom. When he was finished with Doe's hair, appellant went outside to finish smoking his marijuana. He saw lights come on in the garage. When he came back inside, no one was around, then Doe came in. Her demeanor seemed different than it had been earlier, more energetic, and she was wearing "a little black robe." Appellant thought she seemed high on methamphetamine rather than marijuana, from her demeanor and because she was coming from the garage, which appellant knew was where she went to use methamphetamine.

Appellant said he was going to watch movies in Doe's daughter's room, where he was staying. Doe asked him to sleep in the boys' room with her. Appellant went with her to talk in the boys' room, intending to leave once she fell asleep. He walked into the

6

room and got in one of the beds as Doe followed, closed the door and got in the other bed.  She asked if she could massage his head, so he sat on her bed, then lay down next to her when she asked him to.  She massaged his head, then kissed him several times on his face and put his hand on her waist or hip.  Doe pulled appellant on top of her and he "went with the flow."  She pushed him "down" to her "privates" and he licked or kissed her thigh, then moved back up, kissing her on the stomach, neck and mouth.  They undressed and had intercourse.  Doe "shush[ed]" appellant because he was making grunting noises, told him to slow down, and held him for a little while afterward.  Appellant then went to the other bed, turned away from Doe, threw the blanket over his head and went to sleep.  He was "disgusted":  "When I couldn't stop myself at one point because something was going on and at another I—it was over with and, you know, it just—it was—it wasn't good."  Appellant testified that he knew it was morally and legally wrong to have intercourse with his sister but still chose to do so.  At the time, he "wasn't thinking about it being right or wrong," he was "just going with the flow." Appellant testified that he was "buzzed" from the marijuana and beer he consumed, but he remembered what happened.

In the morning, Michael came into the room asking if appellant was ready to go to work.  Appellant got up, left the room, and went to work with Michael.  About an hour later, he called Doe and said he was not going to move in with her and Michael, which Doe had wanted him to do.  She said "it's okay, it's no big deal," and told him to just come and get his things and he said "okay" although he knew he was not going to go back.  He filled out a job application, then went to sleep in Michael's car.  After lunchtime, Michael came and opened the car door, saying Doe had just called and said appellant raped her.  Standing outside the car, appellant called Doe but Son answered and said Doe was "freaking out" and crying and would not get on the phone.  Son agreed to put the phone to Doe's ear and appellant asked her, "Why are you doing this?"

Appellant acknowledged that in 1983, when he was 12 years old, he raped a woman at knifepoint in her home, having entered the house in order to do so.  He

7

acknowledged first asking the woman for $20, but denied that his purpose in entering the house was to get money. Appellant admitted the offense in court and spent eight years in the California Youth Authority. The victim, who was 28 years old at the time of the rape, testified that appellant first asked her for $20, then threatened her with the knife and raped her. Appellant additionally acknowledged having been convicted in 1993 for felony residential burglary, in 2002 for felony forgery and misdemeanor false personation, in 2005 for misdemeanor false identification to a police officer, and in 2006 for felony car theft.

**DISCUSSION**

Appellant contends that section 285[3] violates the right to liberty under the due process clause of the Fourteenth Amendment by criminalizing consensual sexual activity between adults. His argument is based on *Lawrence v. Texas* (2003) 539 U.S. 558 (*Lawrence*), which found unconstitutional a Texas statute prohibiting " 'deviate sexual intercourse with another individual of the same sex.' " (*Id.* at p. 563.)

*Lawrence* overruled the decision in *Bowers v. Hardwick* (1986) 478 U.S. 186 (*Bowers*), which had upheld a state law criminalizing adult consensual sodomy. (*Lawrence, supra,* 539 U.S. at p. 578.) *Bowers* defined the question as whether the federal constitution "confers a fundamental right upon homosexuals to engage in sodomy" and answered in the negative. (*Lawrence,* at pp. 566, 578.) Although both decisions involved convictions based on consensual adult sexual conduct, *Lawrence* framed the issue differently, asking "whether the petitioners were free as adults to engage

---

[3] Section 285 defines prohibited incest by reference to statutes prohibiting marriage between specified parties: "Persons being within the degrees of consanguinity within which marriages are declared by law to be incestuous and void, who intermarry with each other, or who being 14 years of age or older, commit fornication or adultery with each other, are punishable by imprisonment in the state prison." Family Code section 2200 declares: "Marriages between parents and children, ancestors and descendants of every degree, and between brothers and sisters of the half as well as the whole blood, and between uncles and nieces or aunts and nephews, are incestuous, and void from the beginning, whether the relationship is legitimate or illegitimate."

in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution." (*Id.* at p. 564.) *Lawrence* emphasized the liberty and autonomy interests at stake: "[O]ur laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . [¶] 'These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.'" (*Id.* at p. 574, quoting *Planned Parenthood of Southeastern Pa. v. Casey* (1992) 505 U.S. 833, 851.)

Urging that there is no more justification for criminalizing consensual adult incestuous conduct than there is for criminalizing consensual adult homosexual conduct, appellant draws upon the *Lawrence* court's refusal to view majoritarian moral views as a sufficient basis for defining a criminal law. *Lawrence* recognized that the historic condemnation of homosexual conduct as immoral that the *Bowers* court discussed was "shaped by religious beliefs, conceptions of right and acceptable behavior, and respect for the traditional family," and that these concerns were held by many persons as "profound and deep convictions accepted as ethical and moral principles to which they aspire and which thus determine the course of their lives." (*Lawrence, supra,* 539 U.S. at p. 571.) But the Court found these considerations did not answer the question it had to resolve: "The issue is whether the majority may use the power of the State to enforce these views on the whole society through operation of the criminal law. 'Our obligation is to define the liberty of all, not to mandate our own moral code.' " (*Ibid.*, quoting *Planned Parenthood of Southeastern Pa. v. Casey, supra,* 505 U.S. at p. 850.) *Lawrence* explained, drawing on Justice Stevens's dissent in *Bowers*: " 'Our prior cases make two propositions abundantly clear. First, the fact that the governing majority in a State has

9

traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice; neither history nor tradition could save a law prohibiting miscegenation from constitutional attack. Second, individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of "liberty" protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons.' [Citation.]" (*Lawrence,* at pp. 577-578, quoting *Bowers, supra,* 478 U.S. at p. 216, dis. opn. of Stevens, J.) [fns, and citations removed by *Lawrence* court].)

As appellant recognizes, *People v. Scott* (2007) 157 Cal.App.4th 189, 192 (*Scott*), rejected the contention that criminalization of incest between consenting adults violates the due process rights explicated in *Lawrence*[4] The defendant in *Scott* had sex with his daughter shortly after her 18th birthday. (*Id.* at p. 191.) The daughter had been raised by another relative and had seen her father only occasionally during her childhood. After a family party celebrating her birthday, the father got into bed with the daughter, who was fully clothed, pulled down her pants and had intercourse; she was "quietly crying and 'scared.' " (*Id.* at pp. 191-192.) Immediately afterward, she left the house and later told

_____

[4] *Scott* was cited with approval in *In re Marriage Cases* (2008) 43 Cal.4th 757, 829, footnote 52, as an example of cases explaining "why our nation's culture has considered [polygamous or incestuous relationships] inimical to the mutually supportive and healthy family relationships promoted by the constitutional right to marry" and holding that "the state continues to have a strong and adequate justification for refusing to officially sanction polygamous or incestuous relationships because of their potentially detrimental effect on a sound family environment." The Supreme Court emphasized that its conclusion that "the constitutional right to marry properly must be interpreted to apply to gay individuals and gay couples does not mean that this constitutional right similarly must be understood to extend to polygamous or incestuous relationships" and "does not affect the constitutional validity of the existing legal prohibitions against polygamy and the marriage of close relatives." (*Ibid.*) These statements are not dispositive of the issue in the present case, of course, because the question here is not whether the state may prohibit marriage between close relatives but, whether it may criminalize consensual sexual relationships between such relatives.

other relatives what had happened. (*Id.* at p. 192.) The father claimed that he had fallen asleep in his bed, thought he was with his girlfriend, and stopped having intercourse as soon as he realized he was in bed with his daughter. (*Ibid.*)

*Scott* presumed for purposes of the defendant's argument that the intercourse in that case was consensual, because consent is not a defense to incest and the jury made no finding that the intercourse was not consensual. (*Scott, supra*, 157 Cal.App.4th at p. 193, fn. 5.) The court recognized that *Lawrence* "noted 'an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex' " but reasoned that "[d]espite the *Lawrence* court's broad pronouncements regarding the liberty interests of persons 'in matters pertaining to sex' (*Lawrence, supra*, 539 U.S. at p. 572), *Lawrence* dealt only with sodomy between consenting adults of the same sex. It did not deal with other 'matters pertaining to sex,' including consensual incest between adult members of the opposite sex who are related by consanguinity. Indeed, the court emphasized the limited nature of its holding by noting that the case before it did not involve, among other things, 'persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused.' (*Lawrence,* at p. 578.) This aptly describes adult daughters, who are typically in positions of vulnerability vis-à-vis their older, and thus more authoritative fathers, 'in matters pertaining to sex.' " (*Scott,* at p. 193.)

Appellant urges that the present case should yield a different result because of the different relationship Doe held to appellant.[5] *Scott*'s conclusion about the vulnerability

---

[5] Like the *Scott* court, for purposes of appellant's argument, we presume the sex was consensual because the jury made no findings that demonstrate it was not consensual. Contrary to appellant's suggestion, however, we are not convinced that the jury's acquittal on the oral copulation and attempted rape charges demonstrate that it did not believe Doe's version of the events. The oral copulation charge required the jury to find that Doe was unable to resist because she was unaware of the nature of the act in that she was unconscious, asleep, not aware the act was occurring, or not aware of the essential characteristics of the act because the perpetrator tricked, lied to or concealed information from her. (CALCRIM No. 1018.) The attempted rape charge similarly

11

of an adult daughter—in that case, only barely an adult at age 18—to her father, in appellant's view, does not apply to the relationship between a 36-year-old sister and her 38-year-old brother. While the facts of *Scott* may be more extreme, we are not persuaded that this distinction requires a different conclusion. "[T]he state has a legitimate and important interest in protecting families." (*Lowe v. Swanson* (6th Cir. 2011) 663 F.3d 258, 264.) Decisions of the United States Supreme Court "establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition." (*Michael H. V. Gerald D.* (1989) 491 U.S. 110, 123-124.) "The major policy to be effected by a law of incest is the protection of the integrity of the family unit." (Explanatory Note for Model Penal Code § 230.2.) Laws prohibiting incest protect against "the destructive influence of intra-family, extra-marital sexual contact." (*Lowe v. Swanson*, at p. 264.) As *Scott* explained, "[l]ike other states, California has a legitimate interest in maintaining the integrity of the family unit, in protecting persons who may not be in a position to freely consent to sexual relationships with family members, and in guarding against inbreeding. (*State v. Freeman* (2003) 155 Ohio App.3d 492, 497 [2003 Ohio 6730, 801 N.E.2d 906] [incest laws serve legitimate state interest of protecting integrity of family unit]; *Smith v. State* (Tenn.Crim.App. 1999) 6 S.W.3d 512 [incest is punished, among other reasons, to promote and protect family harmony and to protect children from the abuse of parental authority]; *State v. Kaiser* (1983) 34 Wn.App. 559, 566 [663 P.2d 839] [incest statute prevents mutated births]; *State v. Geddes* (1957) 101 N.H. 164, 165 [136 A.2d

required a finding of inability to resist due to unawareness. (CALCRIM No. 1003.) Doe testified that she was aware of the act of oral copulation but at first thought it was Michael, and that once she realized it was appellant, she pretended to be asleep and did not resist the sexual acts because she feared violence might result if Michael learned what was happening. The jury could have believed Doe's testimony and found appellant not guilty because Doe was not "unconscious" and/or was aware of the nature of the act but chose not to resist for reasons other than unconsciousness. In short, while the jury's findings do not reflect a determination that Doe did not consent, neither do the findings indicate she *did* consent.

12

818] [same].)" (*Scott, supra,* 157 Cal.App.4th at p. 194.) These interests are at play in a sexual relationship between siblings.

Challenging the legitimacy of the interests said to justify criminalizing consensual adult incest, appellant argues that incest is *not* universally prohibited and viewed as immoral. Review of the material appellant relies upon, however, indicates that the type of incest involved in the present case, and criminalized by section 285, is almost universally prohibited in the United States. Appellant presents an overview of incest statutes in this country, as set forth in a law review article considering the impact of *Lawrence* on other incest laws: "All but three states criminalize some forms of consensual adult incest. Every state that does so criminalizes at least incest between parents and their children. All but one state that criminalizes incest also applies its laws to sex between siblings. All but six states that criminalize incest extend their laws to sex between aunts or uncles and nephews or nieces. Twenty-two states criminalize sex between stepparents and stepchildren, although some provide for a consent defense between adults. Eight states criminalize sex between first cousins, although two of those states allow the cousins to marry and have sex, if either they are old enough or if at least one of them is sterile. . . . The statutes also vary in how they handle adopted children." (McDonnell, *Privacy Rights in a Post Lawrence World: Responses to Lawrence v. Texas: Is Incest Next?* (2004) 10 Cardozo Women's L.J. 337, 349 [fns. omitted] (*Privacy Rights in a Post Lawrence World*).)

Appellant's point is the variation in how states define prohibited incest, which he sees as undermining the rationale for the interdiction. But the summary makes clear that the relationships covered by section 285—and certainly his relationship with Doe—are prohibited in all but a few states. Section 285 criminalizes incest between parents and children, ancestors and descendants, full siblings, half siblings, uncles and nieces and aunts and nephews. Sibling incest, according to the summary quoted above, is prohibited in 46 of the 50 states in this country; parent/child incest is prohibited in 47 states and uncle/niece and aunt/nephew incest is prohibited in 41 states. By contrast, only eight

13

states criminalize first cousin incest. The author of the law review article from which these facts are drawn noted a trend toward decriminalizing first cousin incest, resulting in fewer states forbidding this type of incest than forbade sodomy before *Lawrence*, but found "the trend toward decriminalizing closer relationship incest is non-existent." (*Privacy Rights in a Post Lawrence World*, *supra*, 10 Cardozo Women's L.J.at p. 350.)

Similarly, if there is force to appellant's argument against the genetic rationale for the incest prohibition, it is largely limited to relationships outside the core of the prohibition. Appellant cites another law review note for the proposition that research within the past two decades "has shown that the children of closely related couples do not have an increased risk of genetic defects, and that in some cases consanguineous parentage may actually decrease the risk of certain diseases." (Note, *Tainted Love: What the Seventh Circuit Got Wrong in Muth v. Frank* (2007) 56 DePaul L.Rev. 1065, 1087-1088, 1090 (*Tainted Love*).) The cited pages discuss research indicating a lack of evidence for the belief that fertility is reduced in consanguineous unions, and state that "[o]ne study has shown that consanguineous parentage may decrease the risk of certain lymphoid malignancies like breast cancer." (*Id.* at p. 1087, citing S. Denic & A. Bener, *Consanguinity Decreases Risk of Breast Cancer—Cervical Cancer Unaffected*, 85 Brit. J. Cancer 1675 (2001). The Note criticizes research finding negative health consequences from recessive genetic traits, and emphasizes that nonincestuous unions can also result in children with recessive genetic traits. (*Tainted Love,* at pp. 1087-1088.) But the strongest affirmative statement that such consequences do not occur is that merely that "[t]he genetic 'dangers' of first-cousin consanguineous unions producing 'damaged' progeny is probably not higher than nonconsanguineous couplings." (*Id.* at p. 1088.)

First cousin incest is not at issue here, and the genetic risk from pairings of closer relatives appears to be much higher. "In any given non-consanguineous relationship, the rate of severe abnormalities in offspring is estimated at two to three percent. For offspring of first cousin incestuous relationships, the risk increases to approximately four

14

to seven percent, while children of siblings or a parent-child coupling have a risk between thirty-one and forty-four percent." (Chan, *Accidental Incest:  Drawling the Line—or the Curtain? —for Reproductive Technology,* 32 Harv. J.L. & Gender 59, 85 [fns. omitted].)[6] This increased risk is surely sufficient to provide a legitimate basis for criminalizing incest, at least for the core relationships covered by section 285.

As *Scott* also explained, "*Lawrence* held that the Texas statute was unconstitutional, not because sodomy between consenting adults is a fundamental right (*Lawrence, supra*, 539 U.S. at p. 586 (dis. opn. of Scalia, J.)), but because the statute 'furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.'  (*Id.* at p. 578.)  *Lawrence* thus 'did not announce . . . a fundamental right . . . for adults to engage in all manner of consensual sexual conduct, specifically in this case, incest.'  (*Muth v. Frank* (7th Cir. 2005) 412 F.3d 808, 817.)

---

[6] The support cited for the quoted statements includes Robin L. Bennett, Louanne Hudgins, Corrine O. Smith & Arno G. Motulsky, Inconsistencies in Genetic Counseling and Screening for Consanguineous Couples and Their Offspring: Recommendations of the National Society of Genetic Counselors, 11 J. Genetic Counseling 97, 104-107 (2002) [cited for examples of studies determining baseline population estimates for major birth defects and genetic disorders; risk for offspring of first cousin relationship 1.7-2.8 percent above the general population risk; 31.4 percent risk for children of sibling or parent-child incestuous relationships]; Bernadette Modell and Aamra Darr, Genetic Counseling and Customary Consanguineous Marriage, 3 Nature Reviews Genetics 225 (2002), available at http://www.nature.com/nrg/journal/v3/n3/full/nrg754.html [estimating 2-2.5% of non-consanguineous matings produce children with birth defects, while first cousin matings produce double that number, but pointing out flaws in data collection]; Helen V. Firth, Jane A. Hurst & Judith G. Hall, Oxford Desk Reference: Clinical Genetics 370 (2005) (Firth et al.).  (*Accidental Incest, supra,* 32 Harv. J.L. & Gender at p. 85, fn. 164, 165.) Firth et al. state that for offspring of first-degree relationships (parent/child or sibling/sibling), "[t]here is an observed increase of 30% in severe abnormalities and mortality, giving an overall risk of ~1/3 for death in childhood or severe abnormality.  In addition, there is an increased risk for mental retardation without physical anomaly bringing overall risk close to 1/2 (50%)."  (Firth et al., *supra,* at p. 370.)  The authors point out that because this observed risk is considerably greater than the probability or estimated risk of 12.5 % in such relationships, "empiric data is preferable over estimated data."  (*Ibid.*)

15

And, although there was no rational basis for the Texas statute in *Lawrence*, there is a rational basis for criminalizing incest, specifically between consenting adults of the opposite sex who are related by consanguinity . . . ." (*Scott, supra,* 157 Cal.App.4th at pp. 93-194.)

Other courts have also rejected claims that the criminalization of incest violates *Lawrence.* (*Lowe v. Swanson, supra,* 663 F.3d 258 [stepfather and adult step-daughter, habeas petition challenging state court decision]; *State v. Lowe* (Ohio 2007) 861 N.E.2d 512 [stepfather and adult step-daughter]; *Muth v. Frank, supra,* 412 F.3d 808 [brother and sister in large, dysfunctional family, separated for years, met as adults, married, had children]; *State v. Freeman, supra,* 801 N.E.2d 906 [father and adult daughter]). *Scott* distinguished *State v. John M.* (Conn.App. 2006) 894 A.2d 376, in which a Connecticut appellate court had invalidated the state's incest statute on equal protection grounds because it criminalized heterosexual conduct, but not homosexual conduct, between equivalently related persons and no legitimate basis justified the classification. (*Scott, supra,* 157 Cal.App.4th at p. 194.) The Connecticut Supreme Court subsequently reversed this decision, interpreting the incest statute to apply equally to homosexual relationships of the requisite degree of kinship. (*State v. John F.M.* (Conn. 2008) 940 A.2d 755, 757, 766-767.)

We agree with the *Scott* court. As *Scott* noted, while *Lawrence* recognized a liberty interest in certain consensual adult sexual conduct, it did not find this interest to be a fundamental right or apply strict scrutiny to invalidate the law. (*Scott, supra,* 157 Cal.App.4th at p. 193; *Muth v. Frank, supra,* 412 F.3d at pp. 817-818; *Lawrence, supra,* 539 U.S. at p. 578.) Even applying a heightened level of scrutiny rather than a traditional "rational basis review," as some courts have found *Lawrence* requires (*Witt v. Department. of Air Force* (9th Cir. 2008) 527 F.3d 806, 816-818 ["Don't Ask Don't Tell" statute regulating military service of homosexual persons must satisfy intermediate level of scrutiny under substantive due process]; *Cook v. Gates* (1st Cir. 2008) 528 F.3d 42, 51-56 [applying intermediate level of scrutiny to reject due process challenge to "Don't

16

Ask Don't Tell" statute]; see *Lowe v. Swanson, supra,* 663 F.3d at pp. 261-263 [recognizing courts' differing interpretations of level of scrutiny applied in *Lawrence*]), California's interests in protecting the integrity of the family unit and protecting against inbreeding are sufficiently important to justify section 285's incest prohibition.

The judgment is affirmed.

_____
Kline, P.J.

We concur:

_____
Haerle, J.

_____
Lambden, J.

| | |
|---|---|
| Trial Court: | Contra Costa County Superior Court |
| Trial Judge: | Hon. Leslie G. Landau |
| Attorney for Appellant: | Maureen M. Bodo<br>By appointment of the Court of Appeal<br>Under the First District Appellate Project<br>Assisted-case system |
| Attorneys for Respondent: | Kamala D. Harris, Attorney General<br>Dane R. Gillette, Chief Asst. Atty. Gen.<br>Gerald A. Engler, Sr. Asst. Atty. Gen.<br>Eric D. Share, Supervising Deputy A.G.<br>Christopher W. Grove, Deputy Atty. Gen. |