COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | |
|---|---|---|
| JODY LYNN MORRIS, | | No. 08-15-00249-CR |
| | § | |
| Appellant, | | Appeal from the |
| | § | |
| v. | | 384th District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC# 20140D02665) |
| | § | |

## **O P I N I O N**

Jody Lynn Morris was convicted of two counts of prohibited sexual conduct (incest) arising out of two episodes of sexual contact with his estranged seventeen-year-old biological daughter. In his main issue on appeal, Morris challenges the constitutionality of the prohibited sexual conduct statute on its face, asking us to overturn his conviction on the basis that the State violated his substantive due process right to privacy by criminally prosecuting him for allegedly consensual private sexual activity with another legal adult[1] in direct contravention to the United States Supreme Court's decision in *Lawrence v. Texas*.[2]

---

[1] The age of consent in Texas is seventeen. See TEX.PENAL CODE ANN. § 22.011(c)(1). However, the Texas Rules of Appellate Procedure require us to redact "the name of any person who was a minor at the time the offense was committed" as sensitive information. *See* TEX.R.APP.P. 9.10(a)(3). Because the biological daughter was over the age of consent but under the age of majority at the time of the offenses, we will refer to her by the initials A.W. in this opinion.

[2] *Lawrence v. Texas*, 539 U.S. 558 (2003).

We disagree with Morris' interpretation of *Lawrence*. The sexual activity at issue here took place against a backdrop of coercion and involved the active manipulation of a relationship where consent might not easily be refused. As such, per the terms of *Lawrence* itself, Morris' conduct fell outside the scope of the constitutionally protected sexual liberty/privacy interest, and he was properly subject to criminal prosecution. We also disagree with his contention that the State failed to prove beyond a reasonable doubt that he knew the person he had sex with was his biological daughter at the time of the offense. His conviction rests on constitutionally sound ground. We will affirm.

## BACKGROUND

Years before the date of this offense, during a trip to visit his nieces and nephews, Morris was approached by his brother's ex-wife with a proposition. She explained that she recently had a medical scare involving a form of cancer that would have made it more difficult for her to have children in the future. She wanted more children, but she could not conceive a child with her then-boyfriend because he had a vasectomy performed years prior and they could not afford to get the vasectomy reversed. She asked if Morris would be willing to impregnate her so that she could have another child and explained that he would not be responsible for the child's care. Morris, then nineteen years' old, agreed. After engaging in sexual intercourse several times, Morris' ex-sister-in-law became pregnant and later gave birth to a girl, A.W. While Morris' name did not appear on the birth certificate (A.W.'s father is listed as being her mother's then-boyfriend), it is essentially undisputed that A.W. is Morris' biological daughter in fact. A.W.'s mother testified that Morris was the only man she had sex with in the time preceding the pregnancy, and that she and her then-boyfriend agreed that the boyfriend would raise A.W. as his own daughter. A.W.'s mother informed Morris about the pregnancy. Five weeks into her pregnancy, Morris returned to

his parents' home in Arizona. Later, when A.W. was five months old, A.W.'s mother informed Morris that their daughter had been born, told Morris the daughter's name, and described her physical appearance.

Years later, after learning that Morris was her biological father, A.W., at sixteen years of age, communicated with Morris through Facebook. A.W.'s mother testified that she had learned about her daughter's Facebook contact with Morris because A.W. had been acting out, running away, and told her that she wanted to live with Morris. A.W.'s mother said she was worried about allowing A.W. to visit Morris, but she agreed to let her temporarily move to Arizona with Morris in order to get to know her father. On Father's Day 2013, Morris' sister Buffy picked A.W. up from Texas and drove her to Arizona. In Arizona, A.W. met Morris, along with several of her cousins and Morris' parents.

Although A.W's mother had originally intended for A.W. to spend only two weeks with Morris, A.W. stayed with Morris for six months because A.W. seemed to be doing well. A.W. attended high school in Arizona.

Six months after A.W. left for Arizona, Morris called A.W.'s mother and told her that he had lost his job. He asked A.W.'s mother if he and A.W. could move back to El Paso and live in the home of A.W.'s mother and A.W.'s stepfather, Bernardo. A.W.'s mother testified that Bernardo did not like the arrangement, but eventually they agreed to allow Morris move in with them in El Paso. A.W.'s mother observed behavior she considered to be inappropriate between Morris and A.W., such as A.W. and Morris falling asleep together on the couch. She also noticed A.W. "acting out" and getting into fights with Morris about boys. A.W.'s mother testified that Morris made A.W. call him "daddy" and would look very displeased when A.W. called her stepfather "daddy." A.W.'s mother characterized Morris' behavior as "overpossessive"—he

3

would not let A.W. have male friends, she could not go outside without telling him where she would be, she would have to answer his phone calls with a view "where you can see who you're talking to." If A.W. did not pick up within a few rings, Morris would be "out the door trying to go and find her, what was she up to, what was she doing."

According to A.W., she and Morris had sex, which at various points consisted of vaginal, anal, and oral intercourse, "[e]very night" both in Texas and Arizona. A.W. testified that on April 10, 2014, while living in El Paso, she had stayed home from school because she had been throwing up and having diarrhea. Morris made sexual advances toward A.W., which she refused. A.W. testified that Morris became angry when she tried to leave the room, and asked "[w]hy are you getting away?" She further testified that he would hit her on the face and punch her. Eventually, she and Morris had vaginal intercourse. Afterwards, she walked to the police station, where a woman took her to the hospital to have a rape kit done. When asked why she continued to have sex with her father, A.W. testified that no one would believe her and Morris had threatened to kill her if she said anything. She testified, that on April 3, Morris had grabbed her head and hit it against a vehicle dashboard, which led to her being diagnosed with a concussion.

Morris did not testify, but the State played the video-recording of his statement to police. In the statement, Morris identifies A.W. as his daughter stating although they were no blood tests done, but A.W. looked just like him and his sister, and that as soon as he saw pictures of A.W. he knew she was his daughter. Morris initially denied having sex with A.W., but later after discussing the age of consent in Texas with police, he admitted to having sex with A.W. four separate times because she begged him to and told him that she did not know or think that Morris was her real father. Morris told police that he did believe A.W. was his daughter and when A.W.'s mother confronted him about having sex with A.W., Morris threw up because he knew he was in the wrong

4

and he "shouldn't have done it, period." When police stepped out of the room, Morris told his sister on the phone that A.W. threatened to report him if he did not have sex with her, but that "it's my fault, too." He told police he did not slam A.W.'s head against the dashboard of his truck and maintained that A.W. received a concussion when he had to slam on the brakes of his vehicle when A.W. tried to get out of the vehicle while it was still moving, though he did admit to slapping her across the face with an open hand after she cussed at him in the car.

## DISCUSSION

Morris raises two issues on appeal. We will address his constitutional challenge first.

In Issue One, Morris asserts that Texas' prohibited sexual contact statute is facially unconstitutional under *Lawrence v. Texas*. We disagree.[3]

*Standard of Review*

The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. CONST. amend. XIV. Due process under the Fourteenth Amendment consists of a substantive as well as a procedural component. *Lakey v. Taylor*, 435 S.W.3d 309, 317 (Tex.App.—Austin 2014, no pet.). "Procedural

---

[3] The State maintains that we need not reach the constitutional issue because Morris failed to raise any constitutional challenge to the prohibited sexual conduct statute in the trial court, meaning the facial constitutionality issue is not preserved for our review. In *Karenev v. State*, the Texas Court of Criminal Appeals held that facial constitutional challenges generally have to first be raised in the trial court or else they are waived on appeal. *Karenev v. State*, 281 S.W.3d 428, 434 (Tex.Crim.App. 2009). However, in support of his argument that this Court can reach his facial constitutional challenge, Morris points us to *Smith v. State*, 463 S.W.3d 890, 896 (Tex.Crim.App. 2015). In *Smith*, the Texas Court of Criminal Appeals reached the facial constitutional issue despite a failure to preserve error in the trial court because the appellant had been convicted under a statute that was already declared unconstitutional and void. *Id*. In explaining its reasoning, the Court suggested that an opinion rendered by the United States Supreme Court invalidating the constitutional basis for a conviction or punishment would make a facial challenge to a statute not subject to usual forfeiture rules. *Id*.

It is undisputed that *Lawrence* dealt not with Texas' incest statute, but with Texas' homosexual conduct statute. However, the breadth of the substantive due process right identified in *Lawrence* and whether *Lawrence* implicitly rendered incest a "non-crime" are at issue in this case. Resolution of those questions is central both to the question of preservation and to the substantive merits issue. As such, we proceed directly to our analysis of whether the incest statute is constitutional on its face.

due process mandates that any government action depriving a person of life, liberty, or property be implemented in a fair manner." *Id*. "In contrast, substantive due process bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." [Internal citation and quotation marks omitted]. *Id*. Here, Morris alleges that the State violated a liberty interest protected under a substantive due process rationale identified in *Lawrence* by prosecuting him under the prohibited sexual conduct statute.

The threshold inquiry in a substantive due process challenge is whether an action infringed on a person's liberty interest. *Anthony v. State*, 209 S.W.3d 296, 305 (Tex.App.—Texarkana 2006, no pet.). Once we determine that the claim implicates a constitutional liberty interest, we review the substantive due process infringement claim using a tiered two-step process. First, we must ascertain the nature of the right being asserted to determine which standard of review applies. *See Fleming v. State*, 376 S.W.3d 854, 859 (Tex.App.—Fort Worth 2012), *aff'd,* 455 S.W.3d 577 (Tex.Crim.App. 2014). If the right is "fundamental," i.e. if it is "implicit in the concept of ordered liberty" or is "deeply rooted in this nation's history and tradition[,]" then strict scrutiny applies. *Fleming*, 376 S.W.3d at 858. Under the strict scrutiny standard, infringement on a fundamental right is permissible only where a government action or regulation is narrowly tailored to further a compelling government interest. *Anthony*, 209 S.W.3d at 305. A failure of adequate tailoring or an insufficient countervailing government interest will render infringement on a fundamental right unconstitutional. *Id.* If the right is not fundamental, then, generally speaking, substantive due process requires only a rational relationship between the regulation and the right being infringed, though other tiers of heightened scrutiny may apply based on the right at issue. *Id.*

A challenge to the constitutionality of a statute may be either facial or as-applied. "[T]o prevail on a facial challenge, a party must establish that the statute always operates

6

unconstitutionally in all possible circumstances." *State v. Rosseau*, 396 S.W.3d 550, 557 (Tex.Crim.App. 2013). In a facial challenge to a statute's constitutionality, courts consider the statute only as it is written, rather than how it operates in practice. *State ex re. Lykos v. Fine*, 330 S.W.3d 904, 908 (Tex.Crim.App. 2011). Facial challenges to statutes are "extremely difficult to prove as all courts presume that the Legislature enacted a constitutional law[.]" *Id.* at 909. A litigant raising an as-applied challenge asserts that a statute is unconstitutional "as applied to his particular facts and circumstances." *Id.* at 910. "Because a statute may be valid as applied to one set of facts and invalid as applied to a different set of facts, a litigant must show that, in its operation, the challenged statute was unconstitutionally applied to him; that it may be unconstitutional as to others is not sufficient (or even relevant)." *Id.*

In this case, Morris raises a facial challenge to the prohibited sexual conduct statute. The portion of the statute challenged by Morris states:

> (a) A person commits an offense if the person engages in sexual intercourse or deviate sexual intercourse with another person the actor knows to be, without regard to legitimacy:
>
>    (1) the actor's ancestor or descendant by blood or adoption . . . .

TEX.PENAL CODE ANN. § 25.02.[4]

Morris is entitled to relief only if he can show that the criminal prohibition against direct-line incest among ancestors and descendants (parent-child, grandparent-grandchild, etc.) is unconstitutional per *Lawrence* under all conceivable circumstances. *Rosseau*, 396 S.W.3d at 557.

*Analysis*

Morris casts his first issue as essentially presenting two questions: first, did *Lawrence*

---

[4] The statute in other sections prohibits sexual intercourse and deviate sexual intercourse among other classes of family members. Those portions are not challenged in this appeal. Each offense under this statute is a third-degree felony unless the offense involved sexual intercourse or deviate sexual intercourse with a direct-line ancestor or descendant by blood or adoption, in which event the offense is a second-degree felony. *See* TEX.PENAL CODE ANN. § 25.02(c).

7

establish a broad substantive due process right to freedom from state intrusion into private sexual activity that necessarily embraces all purportedly consensual incestuous conduct? And second, if so, does a state have adequate justifications for nevertheless infringing on that right by criminalizing such conduct?

We need not answer the second question, because we part ways with Morris on the first question. *Lawrence* did not shield Morris outright from prosecution because by the terms of *Lawrence* itself, sexual criminal laws are constitutional under substantive due process where the activity involves coercion or relationships in which consent may not be easily refused.

### *Interpreting* Lawrence

In *Lawrence v. Texas*, two men were arrested, charged with, convicted of, and fined for violating Texas' homosexual conduct statute, which made it a crime for a person to engage in oral or anal sex with another individual of the same sex, after police entered an apartment and witnessed the men allegedly engaged in sexual activity. *Lawrence*, 539 U.S. at 563. The Court described the men as being adults at the time of the offense and noted that "[t]heir conduct was in private and consensual." *Id.* at 564.

In a factually similar previous case, *Bowers v. Hardwick*, the Court had upheld a similar State of Georgia ban on same-sex sodomy and rejected the contention that the Fourteenth Amendment's substantive due process protections extended to homosexual conduct. *See* 478 U.S. 186, 196 (1986). The majority identified a string of cases dealing with substantive due process and the unenumerated right to privacy,[5] but it framed these cases narrowly as dealing solely with issues related to family decision-making, e.g. childrearing and education, family relationships,

---

[5] The cases cited included *Roe v. Wade*, 410 U.S. 113 (1973); *Loving v. Virginia*, 388 U.S. 1 (1967); *Griswold v. Connecticut*, 381 U.S. 479 (1965); *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); *Prince v. Massachusetts*, 321 U.S. 158 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925).

procreation, marriage, contraception, and abortion. *See id*. at 190. Viewing those cases through the prism of family decision-making, the Court held that the substantive due process clause did not extend so far as to insulate private sexual conduct between consenting adults from government regulation. *Id*. at 189-91 (discussing previous substantive due process cases). The Court also noted that while the Constitution's Due Process Clause did protect liberties that were "implicit in the concept of ordered liberty such that neither liberty nor justice would exist" if they were sacrificed or that were "deeply rooted in this Nation's history and tradition," legal proscriptions against sodomy had "ancient roots" and sodomy was a criminal offense at common law, meaning that the idea of same-sex sexual behavior being protected as a liberty interest failed on both intrinsic or historical grounds. [Internal quotation marks omitted]. *Id*. at 191-92 Ultimately, the Court held that there was no constitutionally protected right for adults to engage in private, consensual sexual conduct, and that even under rational basis review, the fact that the State of Georgia's electorate found same-sex sodomy to be "immoral and unacceptable" was sufficient justification for upholding the law. *Id*. at 195-96.

The Court in *Lawrence*, addressing the petitioner's substantive due process and liberty interest arguments, took a much different view of the liberty interest at issue. The *Lawrence* Court, citing to the same cases cited to in *Bowers*, drew broader implications beyond family-planning from the same line of privacy cases. *See Lawrence*, 539 U.S. at 564–66. The Court identified *Griswold v. Connecticut*, 381 U.S. 479 (1965), as the first of these cases. In *Griswold*, the Court invalidated a state law prohibiting the use of contraceptives as violating "a right to privacy" recognized as a substantive due process liberty interest that inhered as part of "the marriage relation and the protected space of the marital bedroom." *Lawrence*, 539 U.S. at 564–65. The Court then identified *Eisenstadt v. Baird*, 405 U.S. 438 (1972)(striking down a contraceptive ban for non-

9

married couples); *Roe v. Wade*, 410 U.S. 113 (1973)(striking down a law prohibiting abortions); and *Carey v. Population Services International*, 431 U.S. 678 (1977)(plurality opinion striking down law banning sale of contraceptives to persons under age sixteen), as building on that right to privacy by holding that the privacy interest was individual and did not necessarily have to be tied to marriage. *See Lawrence*, 539 U.S. at 565–67.

Finally, addressing *Bowers*, the Court stated that the obligation of the court was "to define the liberty of all, not to mandate its own moral code." It noted that many of the historical rationales against homosexuality did not stand up to historical scrutiny, and that the laws and traditions of the past half-century leading up to *Lawrence* "show[ed] an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex." *Id*. at 571. As such, the Court in *Lawrence* overruled *Bowers* and held both (1) that the gay couple subject to criminal fines for their private consensual sexual conduct had a "right to liberty under the Due Process Clause" to "engage in their conduct without intervention of the government" based on the theory that "there is a realm of personal liberty which the government may not enter" related to adult persons' sexual decision-making, and (2) that the Texas homosexual conduct statute "furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual." [Internal quotation marks omitted]. *Id.* at 578.

In the years immediately after *Lawrence* was issued, multiple lower courts held that *Lawrence* strictly applied only to decriminalize homosexual conduct and that the case did not announce a broader right to freedom from state intrusion in the realm of sexual privacy or autonomy. The State cites many of these cases to support its contention that we must strictly limit *Lawrence* to its facts. *See*, *e.g.*, *Muth v. Frank*, 412 F.3d 808, 817 (7th Cir. 2005)(*Lawrence* dealt narrowly with overruling the "homosexual sodomy" prohibition upheld in *Bowers*); *People v.*

10

*Scott*, 68 Cal.Rptr.3d 592, 595 (Cal.Ct.App. 2007)(stating that "*Lawrence* dealt only with sodomy between consenting adults of the same sex" and "did not deal with other matters pertaining to sex")[Internal quotation marks omitted].

These courts' narrow definition of the right identified in *Lawrence* seems to belie both the broad language of *Lawrence* itself and later statements from the United States Supreme Court apparently confirming the wide scope of the sexual liberty/privacy interest protected by the substantive due process clause. While many courts have attempted to limit *Lawrence* to context of same-sex sodomy, *Lawrence* turned not on narrow equal protection grounds aimed at preventing discrimination against those in the LGBT community, but on the broader concept of sexual decision-making taking place in "a realm of personal liberty which the government may not enter." *Lawrence*, 539 U.S. at 578. This point was reaffirmed in *Obergefell* when the Supreme Court acknowledged that "*Lawrence* confirmed a dimension of freedom that allows individuals to engage in intimate association without criminal liability[.]" *Obergefell v. Hodges*, 135 S.Ct. 2584, 2600 (2015). This language casts doubt on the logic of applying the *Lawrence*-identified liberty interest in a limited fashion.

Still, a wide individual freedom to engage in "intimate association" free from criminal liability does not mean that the State cannot impose criminal sanctions on *any* sexual activity, as Morris asserts. That much was made clear in *Lawrence* itself. In defining the scope of the sexual freedom/privacy liberty interest free from State intrusion, the Court in *Lawrence* issued multiple important caveats: "The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution." *Lawrence*, 539 U.S. at 578.

From this statement, we can surmise two things about the right to sexual privacy. By

11

negative implication, we can conclude that consensual sexual activity that (1) does not involve minors, (2) does not involve persons who might be injured or coerced, (3) does not involve a relationship where consent might not be easily refused, (4) occurs in private, and (5) does not involve prostitution is constitutionally protected from State intrusion, though the nature of that right and the level of scrutiny applied to justify potential infringement of that right remains to be seen. By contrast, sexual activity that involves minors, injury or coercion, relationships where consent might not be easily refused, public conduct, or prostitution is *not* protected by the privacy right recognized in *Lawrence*, meaning that such conduct is currently still subject to potential criminal regulation.

So, in light of *Lawrence*, what of incest? The State argues that incestuous activity may still be criminalized at large even post-*Lawrence* because it falls within the second and third *Lawrence* carveouts, dealing with coercion and relationships where consent might not be easily refused. The State also advances the argument that even if incest falls within the bounds of sexual privacy liberty interest announced in *Lawrence*, traditional morality, family cohesion interests, and public health grounds justify state infringement on that activity, as the inbreeding that occurs in incestuous relationships can lead to a higher incidence of birth defects. *See, e.g., People v. McEvoy*, 154 Cal.Rptr.3d 914, 923 (Cal.Ct.App. 2013)(upholding sibling incest ban on genetic and family cohesion grounds); *State v. Lowe*, 861 N.E.2d 512, 517-18 (Ohio 2007)(upholding incest ban as to stepparent and stepchild under rational basis review on grounds of maintaining family unit integrity). Morris points us to academic literature in which commentators question whether *Lawrence* applies in "victimless" situations where there is no coercive undercurrent running between adult parties, such as in cases where children descended from a single sperm donor at a fertility clinic might years later unknowingly enter into relationships with their half-siblings, or

even in cases where two adults of similar age and mental capacity consensually enter into a sexual relationship fully aware that they are related but their sexual conduct is otherwise private. *See* Y. Carson Zhou, *The Incest Horrible: Delimiting the Lawrence v. Texas Right to Sexual Autonomy*, 23 MICH. J. GENDER & L. 187, 242 (2016)(arguing that under *Lawrence* adult incest may only be constitutionally banned in situations where *inter alia* sexual intercourse can lead to pregnancy and the parties had significant contact before age eighteen); *see also* Naomi Cahn, *Accidental Incest: Drawing the Line—Or the Curtain?—for Reproductive Technology*, 32 HARVARD J.L. & GENDER 59, 63-67 (2009)(identifying accidental unknowing incest between children of a single sperm donor as an issue, calling both for a legislative limit to the number of offspring, and suggesting that even under *Lawrence* father-daughter criminal incest bans are permissible due to "power asymmetries" but conceding that power dynamic concerns are less at issue in inadvertent half-sibling relationships). At least one commentator has argued both that (1) public health grounds alone cannot be invoked to justify incest bans post-*Lawrence* for sexual acts that are unlikely to result in pregnancy, and that (2) even in situations where pregnancy is a possibility, the State cannot ban incestuous relationships solely on the ground that birth defects are more likely to result from such pregnancies, given that in a line of eugenics-era cases, the United States Supreme Court rejected the increased probability of birth defects in future offspring as a ground for state sterilization of individual persons. *See* Zhou, *The Incest Horrible*, 23 MICH.J. GENDER & L. at 236-37.

Thorny as the hypothetical situations presented in these academic articles may be, the specter of potential unconstitutional applications does not resolve the case before us. This is a *facial* challenge to the statute. Even assuming a statute may be unconstitutionally applied under some set of circumstances (a question we need not reach here), a facial challenge is successful

13

only when a statute is unconstitutional in *all* circumstances. *See State ex rel. Lykos*, 330 S.W.3d at 909. For all the constitutional vagueness left open in *Lawrence*'s wake, *Lawrence* itself leaves no doubt that sexual activity that involves coercion or manipulation of a relationship in which consent may not be easily refused falls outside the scope of the sexual liberty/privacy right protected by substantive due process. *Lawrence*, 539 U.S. at 578. Section 25.02(a)(1), prohibiting sexual intercourse and deviate sexual intercourse among direct-line ancestors and descendants, directly touches on precisely those types of relationships most subject to manipulation in which consent may not be easily refused: the intergenerational relationships between parent and child and grandparent and grandchild.

For facial constitutionality analysis purposes, it is irrelevant whether there may be possible unconstitutional applications of the prohibited sexual conduct statute as applied to certain facts. It is sufficient for our purposes to recognize that there are situations such as this one in which a direct-line family relationship can lead to coercion and situations in which consent might not be easily refused, and that such situations fall outside the ambit of *Lawrence* to uphold Section 25.02(a)(1) as being facially constitutional. Courts that have addressed this scenario agree with this general assessment. *See, e.g., McEvoy*, 154 Cal.Rptr.3d at 920–21 (finding in father-daughter incest case that *Lawrence* carveout for "persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused . . . aptly describes adult daughters, who are typically in positions of vulnerability vis-à-vis their older, and thus more authoritative fathers . . . ."). [Internal quotation marks omitted]. And even commentators with the broadest possible view of *Lawrence* agree that a State may still constitutionally prohibit direct-line incest under appropriate circumstances based on coercion concerns. *See* Zhou, *The Incest Horrible*, 23 MICH. J. GENDER & L. at 242.

Because the statute can be constitutionally applied in those situations and is specifically aimed at regulating those vulnerable relationships and is not solely intended to stigmatize sexual conduct among consenting adults, the ban on direct-line incest does not fail on facial constitutional grounds under *Lawrence*.  And because Morris does not and cannot bring an as-applied challenge to the constitutionality of Section 25.02(a)(1) under the specific facts of his case, we need not address his unpreserved argument that his allegedly consensual sex with his seventeen-year-old estranged daughter—a daughter who testified that she suffered physical and sexual abuse after attempting to reconnect with him for the first time in her life and who told the jury she feared he would kill her if she told him no—is constitutionally comparable to the private, coercion-free consensual sexual activity at issue in *Lawrence*.

Morris is likely correct that *Lawrence* now places a substantive limit on the criminalization of sexual activities once thought to be obviously subject to state regulation, even if some may find those sexual activities distasteful or immoral.  *See Lawrence*, 539 U.S. at 571–72 (stating that the Supreme Court's task in interpreting the Constitution "is to define the liberty of all, not to mandate our own moral code" and holding that the line of privacy cases "show an emerging awareness that liberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex").  But this case is not the appropriate vehicle to test *Lawrence*'s limits.  Texas' direct-line incest statute is not facially unconstitutional.  *Lawrence* does not shield Morris' abuse of his daughter from consequences under the guise of privacy here.  His prosecution and conviction were fair constitutional game.

Issue One is overruled.

**Legal Sufficiency**

Having disposed of Morris' constitutional challenge, we next turn to legal sufficiency.  In

Issue Two, Morris contends that the State failed to prove beyond a reasonable doubt that Morris knew A.W. was his daughter at the time of the offense. We disagree.

*Standard of Review*

On legal sufficiency review, we assess all trial evidence "in the light most favorable to the prosecution," to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We review all record evidence in making this determination. *Clayton*, 235 S.W.3d at 778. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). In this procedural posture, we are not permitted to sit as the "thirteenth juror" and substitute our judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010); *Goodman v. State*, 66 S.W.3d 283, 286 n.4 (Tex.Crim.App. 2001). Even so, we act as a procedural failsafe against irrational verdicts, and we may reverse a conviction on legal sufficiency grounds where no rational juror could find guilt beyond a reasonable doubt based on the evidence presented at trial. *Clayton*, 235 S.W.3d at 778. This encompasses both situations in which the State has failed to prove an essential element of the crime as a matter of law (i.e. the evidence is quantitatively insufficient) and situations in which some evidence exists on every element, but no reasonable person could convict based on the state of evidence as a whole, even when viewed in the light most favorable to the prosecution (i.e. the evidence is qualitatively insufficient). *See Jackson*, 443 U.S. at 320 (constitutional legal sufficiency standard in criminal cases higher than "mere modicum" evidence standard); *Brooks v. State*, 323 S.W.3d 893, 906–07 (Tex.Crim.App. 2010).

16

*Analysis*

Viewing the record in the light most favorable to the prosecution, we find there was sufficient evidence to show beyond a reasonable doubt that Morris knew A.W. was his daughter. A.W.'s mother testified that she only had sex with Morris in the time period before she became pregnant, and that the man listed on A.W.'s birth certificate as her father had had a vasectomy. Furthermore, although Morris later told police he was unsure of whether A.W. was in fact his daughter, the record is replete with statements in which Morris acknowledged that he believed that A.W. was his daughter, including statements of remorse during his interview with police. These factors taken together establish that the jury's verdict rested on sufficient evidence.

Issue Two is overruled.

## CONCLUSION

Neither of Morris' appellate points are meritorious. The judgment of the trial court is affirmed.

January 31, 2019

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.
Hughes, J., Not Participating

(Do Not Publish)